# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| MCLANE COMPANY, INC. d/b/a MCLANE/SOUTHWEST, MCLANE/SOUTHEAST, MCLANE SOUTHEAST, MCLANE/NORTHWEST, MCLANE/SOUTHEAST – DOTHAN, MCLANE/ HIGH PLAINS, and MCLANE/NORTH TEXAS; MCLANE/MID-ATLANTIC, INC. d/b/a MCLANE BLUEGRASS; MCLANE/MIDWEST, INC., d/b/a MCLANE/CUMBERLAND, MCLANE/MIDWEST, MCLANE MIDWEST, and MCLANE/OZARK; MCLANE MINNESOTA, INC.; MCLANE NEW JERSEY, INC.; MCLANE/EASTERN, INC. d/b/a MCLANE/NORTHEAST, MCLANE/NORTHEAST-CONCORD, and MCLANE PA; MCLANE SUNEAST, INC., d/b/a MCLANE/PACIFIC, MCLANE/SOUTHERN CALIFORNIA, MCLANE/SUNWEST, MCLANE SUNWEST, MCLANE/SUNEAST, and MCLANE OCALA; MCLANE OHIO, INC.; MCLANE/SOUTHERN, INC.; MCLANE/WESTERN, INC.; KINEXO, INC.; MCLANE FOODSERVICE DISTRIBUTION, INC.; MCLANE FOODSERVICE, INC.; PEPSICO, INC.; PEPSI-COLA ADVERTISING AND MARKETING, INC.; SVC MANUFACTURING, INC.; FRITO-LAY, INC.; THE QUAKER OATS COMPANY; QUAKER MANUFACTURING, LLC; BIMBO BAKERIES USA, INC.; BIMBO BAKEHOUSE LLC; BIMBO BAKEHOUSE INC.; BB GLOBAL INVESTING HOLDING, S.L.; and GRUPO BIMBO, S.A.B. DE C.V.<br><br>         Plaintiffs,<br><br>  v. | **COMPLAINT**<br><br><br>**Jury Trial Demanded** |

ASR GROUP INTERNATIONAL, INC.,
AMERICAN SUGAR REFINING, INC.,
DOMINO FOODS, INC., UNITED SUGAR
PRODUCERS & REFINERS
COOPERATIVE f/k/a UNITED SUGARS
CORPORATION, IMPERIAL SUGAR CO.
n/k/a UNITED STATES SUGAR
SAVANNAH REFINERY, LLC, MICHIGAN
SUGAR COMPANY, LOUIS DREYFUS
COMPANY LLC, COMMODITY
INFORMATION, INC., and RICHARD
WISTISEN,

Defendants.

# Table of Contents

I.  NATURE OF THE ACTION ................................................................................ 2

II.  JURISDICTION AND VENUE ........................................................................... 7

III.  THE PARTIES ................................................................................................... 8

    A.  Plaintiffs ................................................................................................ 8

    B.  Defendants ........................................................................................... 14

        1.  ASR Defendants .......................................................................... 14

        2.  United .......................................................................................... 15

        3.  Louis Dreyfus ............................................................................. 16

        4.  Imperial n/k/a U.S. Sugar Savannah .......................................... 16

        5.  Michigan Sugar Company .......................................................... 16

        6.  Commodity Defendants .............................................................. 16

        7.  Agents and Co-Conspirators ...................................................... 17

IV.  FACTUAL ALLEGATIONS ............................................................................. 18

    A.  The Domestic Refined Sugar Market and its Commercial Development ............. 18

    B.  The Relevant Market ........................................................................... 21

        1.  Refined Sugar is the Relevant Product Market. ......................... 22

        2.  In the Alternative, Granulated Sugar is the Relevant Product Market. ......................................................................... 24

        3.  The United States is the Relevant Geographic Market. ............. 25

    C.  Defendants Possess Market Power in the Relevant Markets .............. 26

    D.  Defendants' Unlawful Conduct ........................................................... 30

        1.  Defendants Unlawfully Shared Confidential Price and Sales Information With Each Other. ............................................. 30

        2.  Defendants Relied Upon the Competitively Sensitive Information Exchanged to Further Their Price-Fixing Conspiracy. ............................. 41

        3.  Defendants Agreed on a Common Formula to Fix Prices. ......... 44

        4.  Sugar Prices Increased in Parallel During the Relevant Time Period. ................................................................................. 45

    E.  Additional Plus Factors Support the Existence of a Conspiracy ........ 51

        1.  The Defendants Engaged in Conduct That, Absent Collusion, Would Have Been Contrary to Their Self-Interest. .................... 52

        2.  The Market is Highly Concentrated, and the Defendants Are the Dominant Firms. .............................................................. 53

| | | | |
|---|---|---|---|
| | **3.** | Barriers to Entry Are High. | 54 |
| | **4.** | Demand for Sugar is Inelastic. | 54 |
| | **5.** | Defendants Are Vertically Integrated. | 55 |
| | **6.** | Defendants Had Numerous Opportunities to Collude. | 55 |
| | **7.** | Refined Sugar is a Commodity. | 58 |
| | **8.** | There is a History of Anticompetitive Conduct in the Sugar Industry. | 59 |
| | **F.** | Defendants' Information Exchange is an Independent Violation of Section 1 of the Sherman Act. | 60 |
| | **G.** | The USDA Sugar Program Does Not Render the Conspiracy Any Less Plausible. | 65 |
| | **H.** | Defendants' Anticompetitive Conduct Proximately Caused Plaintiffs to Suffer Antitrust Injury and Damages. | 68 |
| **V.** | | **TOLLING AND FRAUDULENT CONCEALMENT** | 68 |
| **VI.** | | **CLAIMS FOR RELIEF** | 70 |

Plaintiffs McLane Company, Inc. d/b/a McLane/Southwest, McLane/Southeast, McLane Southeast, McLane/Northwest, McLane/Southeast – Dothan, McLane/High Plains, and McLane/North Texas; McLane/Mid-Atlantic, Inc, d/b/a McLane Bluegrass; McLane/Midwest, Inc., d/b/a McLane/Cumberland, McLane/Midwest, McLane Midwest, and McLane/Ozark; McLane Minnesota, Inc.; McLane New Jersey, Inc.; McLane/Eastern, Inc., d/b/a McLane/Northeast, McLane/Northeast-Concord, and McLane PA; McLane Suneast, Inc. d/b/a McLane/Pacific, McLane/Southern California, McLane/Sunwest, McLane Sunwest, McLane/Suneast, and McLane Ocala; McLane Ohio, Inc.; McLane/Southern, Inc.; McLane/Western, Inc.; Kinexo, Inc.; McLane Foodservice Distribution, Inc.; McLane Foodservice, Inc. (collectively, "McLane"); PepsiCo, Inc.; Pepsi-Cola Advertising and Marketing, Inc.; SVC Manufacturing, Inc.; Frito-Lay, Inc.; The Quaker Oats Company; Quaker Manufacturing, LLC (collectively, "PepsiCo"); Bimbo Bakeries USA, Inc.; Bimbo Bakehouse LLC; Bimbo Bakehouse Inc.; BB Global Investing Holding, S.L.; and Grupo Bimbo, S.A.B. de C.V. (collectively, "Bimbo"), (collectively with McLane, PepsiCo, and Bimbo as "Plaintiffs") bring this action for damages and injunctive relief[1] against Defendants ASR Group International, Inc. ("ASR Group"); American Sugar Refining, Inc. ("ASR"); Domino Foods, Inc. ("Domino," together with ASR Group and ASR, "ASR/Domino"); United Sugar Producers & Refiners Cooperative f/k/a United Sugars Corporation ("United"); Imperial Sugar Co. n/k/a United States Sugar Savannah Refinery, LLC ("Imperial"); Michigan Sugar Company ("Michigan Sugar");

---

[1] Although the district court dismissed class plaintiffs' claims for injunctive relief in the parallel consolidated class actions (*In Re: Granulated Sugar Antitrust Litigation*, No. 0:24-md-03110 (D. Minn.), ("*Granulated Sugar*") Dkt. No. 471 at 36), Plaintiffs assert these claims herein for the purpose of preserving for appellate review their right to challenge dismissal of these claims.

Louis Dreyfus Company LLC ("Louis Dreyfus"); (collectively, the "Producer Defendants");[2] Commodity Information, Inc. ("Commodity"), and Richard Wistisen ("Wistisen," together with Commodity, "Commodity Defendants," and the Commodity Defendants together with the Producer Defendants, "Defendants"). Plaintiffs allege, upon knowledge to themselves and their own acts, and upon information and belief as to all other matters, as follows:

## I.    NATURE OF THE ACTION

1.    This action arises from Defendants' unlawful agreement to fix prices of Refined Sugar as defined below, in the United States. The Producer Defendants are among the largest producers and sellers of Refined Sugar in the United States and are direct competitors.

2.    At least as early as January 1, 2019, and continuing to the present ("Relevant Period"), Defendants conspired to artificially inflate the price of Refined Sugar in the United States. Among the victims of the conspiracy are entities such as Plaintiffs that directly purchased Refined Sugar from the Producer Defendants. As the Supreme Court declared decades ago, "the machinery employed by a combination for price-fixing is immaterial. Under the Sherman Act[,] a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal per se." *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223 (1940).

3.    During the Relevant Period, Plaintiffs directly purchased significant quantities of Refined Sugar, including but not limited to Granulated Sugar (defined below) from one or more of the Producer Defendants.

---

[2] Although the district court dismissed Defendants Michigan Sugar, Louis Dreyfus, and Imperial from the parallel consolidated class actions, Plaintiffs expressly name these Defendants herein for the purpose of preserving for appellate review their right to challenge those dismissals. *Id*.

4.      To implement their price-fixing conspiracy, Defendants exchanged detailed, competitively sensitive, non-public information ("CSI") about Refined Sugar prices, capacity, sales volume, supply, and demand, in addition to other conduct alleged herein. The United States Department of Justice ("DOJ") has stated that the sharing of CSI among horizontal competitors "support[s] an inference that a price-fixing or out-put restriction agreement exists," but also "is itself a form of concerted action that can violate the antitrust laws."[3] The Defendants' sharing of CSI bears all the hallmarks of concerted information sharing and demonstrates an effective enforcement mechanism of a price-fixing scheme.

5.      The Commodity Defendants, which maintained the information clearinghouse, provided the Producer Defendants with access to real-time information on current and forward-looking, non-anonymized data from competitors. The Producer Defendants agreed to use Commodity's clearinghouse to access this non-anonymized data to fix and maintain the prices of Refined Sugar.

6.      The Producer Defendants shared specific information, through Commodity's clearinghouse, on their profits, pricing, costs, production levels, and sold positions[4]—all of which are key metrics and highly confidential and competitively sensitive in this market, that competitors would not share with each other in the absence of an agreement to do so.

7.      The information gathered by and disseminated through Commodity was made available only to subscribing sugar-producer, owner, or marketer members. It is completely

---

[3] Amicus Brief filed by the DOJ in *In re Pork Antitrust Litig.*, No. 0:18-cv-01776 (D. Minn.) ("*Pork*") (Dkt. No. 2616), at 5–6.

[4] A sold position, as referred to herein, is the percentage of a seller's supply of Refined Sugar that is no longer available to purchase. As a seller's sold position increases that seller will generally raise prices. The sold position thus provides important information about the extent to which a supplier will or will not be aggressive on prices going forward.

unavailable to the public or to non-subscribing members. Simply put, Commodity, and the Producer Defendants engaged in a "give to get" scheme, whereby they gave one another mutual and reciprocal assurances that each would provide CSI so long as the others did so.

8.      The antitrust laws do not allow competitors to exchange CSI in an effort to stabilize or control industry pricing. It does not matter whether the exchange is direct or through an intermediary, such as Commodity.

9.      It was contrary to each of the Producer Defendant's self-interest to share CSI with horizontal competitors. It was only the reciprocal and mutual agreement to share such information, which facilitated and maintained the price-fixing conspiracy, that reassured each Producer Defendant that its co-conspirators would adhere to the conspiracy and justified the information-sharing. This information-sharing thus served as an important monitoring and enforcement mechanism for the cartel.

10.     The information sharing specifically allowed the Producer Defendants to coordinate their pricing strategies based on the prices of raw sugar-futures contracts, as discussed below. The reciprocal and mutual sharing of such information facilitated and maintained the price-fixing conspiracy and reassured each Producer Defendant its co-conspiring counterparts would adhere to the conspiracy. The ubiquitous sharing of such information, as in this case, also serves an important monitoring and enforcement mechanism for the cartel.

11.     In the *Granulated Sugar* class action litigation, the DOJ filed a Statement of Interest requesting that the Court reject Defendants' efforts to impose a "heighten[ed] [] pleading bar for Section 1 information-exchange" claims when the exchanges occur through or are orchestrated by go-betweens instead of directly between competitors."[5] There, the DOJ observed that an

---

[5] Statement of Interest filed by the DOJ in *Granulated Sugar* (Dkt. No. 415), June 24, 2025, at 2.

"agreement to share information, on its own," could amount to an antitrust violation, *Granulated Sugar*, Dkt. No. 415 at 7. Turning to the Class Plaintiffs' allegations—which are substantially similar to those at issue here — the DOJ concluded that Class Plaintiffs had plausibly alleged participation in an "information-sharing" scheme. *Id*. at 12-13. The DOJ based that conclusion on two related allegations: that Defendants submitted the requested data to Wistisen knowing he would in turn share it with their rivals, and that Defendants received corresponding data about their competitors. The Court agreed with the DOJ and denied Defendants United and ASR/Domino's Motions to Dismiss the Section 1 information-exchange claims, ruling that class plaintiffs plausibly alleged "both concerted action and anticompetitive effect." *Granulated Sugar*, Dkt. No. 471 at 28.

12.     In its amicus brief in *Pork*, in which a similar information broker with a subscription service (Agri Stats) facilitated producers sharing of CSI, the DOJ further expressed its view that information sharing is "itself a form of concerted action that can violate the antitrust laws."[6] Such conduct would be tested under the rule of reason or some variation thereof. Plaintiffs have pled this alternative cause of action against all Defendants.

13.     Additional "plus factors" indicate that Defendants were colluding rather than responding to common, external stimuli. These plus factors include (but are not limited to): actions that were contrary to the Defendants' unilateral self-interests; the structure of the Refined Sugar industry, which is vertically integrated and highly concentrated; high barriers to entry; the fact that Refined Sugar is a commodity product, for which demand is inelastic; and the Producer Defendants' numerous opportunities to collude, including through meetings at trade organization events.

---

[6] Amicus Brief filed by the DOJ in *Pork* (Dkt. No. 2616), at 5–6.

14.     Defendants were able to successfully implement their conspiracy because the sugar industry is structurally susceptible to collusion. For more than 80 years, the industry has been marked by repeated violations of the antitrust laws, including conduct similar to the conduct alleged here.

15.     As a result of Defendants' conspiracy, Refined Sugar prices reached all-time highs during the Relevant Period. Figure 1 below shows prices for Refined Sugar spiking at the onset of the Relevant Period in January 2019, and reaching an all-time high in 2024.[7]



Figure 1

There were no demand or supply shocks occurring in 2019 that could otherwise explain this severe deviation from a prior five-year trend of steady sugar prices.

---

[7] U.S. Bureau of Labor Statistics, *Producer Price Index by Commodity: Processed Foods and Feeds: Refined Sugar Products and Byproducts [WPU0253]*, FRED, Federal Reserve Bank of St. Louis (July 15, 2026), https://fred.stlouisfed.org/series/WPU0253.

16.     Defendants' actions resulted in Plaintiffs paying more for Refined Sugar during the Relevant Period than they would have paid in a competitive market but for the unlawful conspiracy and the acts in furtherance alleged herein. Defendants' anticompetitive conduct, described further herein, violates Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3), and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a), 26).

## II.     JURISDICTION AND VENUE

17.     This Court has jurisdiction over the subject matter of this action pursuant to title 28 United States Code Sections 1331 and 1337(a), as this action arises under Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3), and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a), 26).

18.     Venue is proper under Section 12 of the Clayton Act (15 U.S.C. § 22), and under title 28 United States Code Section 1391(b) and (c), because, during the Relevant Period, Defendants resided and/or transacted business in this District and were found in this District. Additionally, a substantial portion of the alleged activity affected interstate trade and commerce in this District.

19.     During the Relevant Period, Defendants' conduct was within the flow of, was intended to, and did in fact have a substantial effect on the interstate commerce of the United States and its territories.

20.     During the Relevant Period, the Producer Defendants sold and shipped Refined Sugar in a continuous and uninterrupted flow of interstate commerce, which included sales and shipments to or from this District. Defendants' conduct had a direct, substantial, and reasonably foreseeable effect on interstate commerce in the United States, including this District.

## III.    THE PARTIES

### A.    Plaintiffs

21.    Plaintiff McLane Company, Inc., d/b/a McLane/Southwest, McLane/Southeast, McLane Southeast, McLane/Northwest, McLane/Southeast – Dothan, McLane/High Plains, and McLane/North Texas is a leading supply chain services company providing grocery and foodservice supply chain solutions to convenience stores, discount retailers, wholesale clubs, drug stores, military bases, and restaurants throughout the United States. McLane Company, Inc. is a Texas corporation with its principal place of business in Temple, Texas. During the Relevant Period, McLane Company, Inc., either by itself or through its subsidiaries and affiliates, purchased substantial amounts of Refined Sugar, including but not limited to Granulated Sugar (as defined below), at artificially inflated prices from one or more of the Producer Defendants.[8]

22.    Plaintiff McLane/Mid-Atlantic, Inc. d/b/a McLane Bluegrass ("McLane Bluegrass") is a Texas corporation with its principal place of business in Temple, Texas. It is a wholly-owned subsidiary of McLane Company, Inc. During the Relevant Period, McLane Bluegrass directly purchased substantial amounts of Refined Sugar, including but not limited to Granulated Sugar, at artificially inflated prices from one or more of the Producer Defendants.

23.    Plaintiff McLane/Midwest, Inc., d/b/a McLane/Cumberland, McLane/Midwest, McLane Midwest, and McLane/Ozark ("McLane/Midwest") is a Texas corporation with its

---

[8] Pursuant to a purchase agreement effective January 30, 2026, The C.D. Hartnett Company, a Texas corporation and formerly, a wholly-owned subsidiary of McLane Company, Inc., has assigned all rights, title, and interest in and to any claims or rights asserted, or to be asserted, in *Granulated Sugar* to McLane Company, Inc.  Between 2019 to January 2026, The C.D. Hartnett Company directly purchased substantial amounts of Refined Sugar, including but not limited to Granulated Sugar, at artificially inflated prices from one or more of the Producer Defendants. Accordingly, McLane Company, Inc., as the assignee, seeks to recover for injury suffered by C.D. Hartnett Company as a result of Defendants' anticompetitive conduct.

8

principal place of business in Temple, Texas. It is a wholly-owned subsidiary of McLane Company, Inc. During the Relevant Period, McLane/Midwest directly purchased substantial amounts of Refined Sugar, including but not limited to Granulated Sugar, at artificially inflated prices from one or more of the Producer Defendants.

24.     Plaintiff McLane Minnesota, Inc. is a Texas corporation with its principal place of business in Temple, Texas. It is a wholly-owned subsidiary of McLane Company, Inc. During the Relevant Period, McLane Minnesota, Inc. directly purchased substantial amounts of Refined Sugar, including but not limited to Granulated Sugar, at artificially inflated prices from one or more of the Producer Defendants.

25.     Plaintiff McLane New Jersey, Inc. is a Delaware corporation with its principal place of business in Temple, Texas. It is a wholly-owned subsidiary of McLane Company, Inc. During the Relevant Period, McLane New Jersey, Inc. directly purchased substantial amounts of Refined Sugar, including but not limited to Granulated Sugar, at artificially inflated prices from one or more of the Producer Defendants.

26.     Plaintiff McLane/Eastern, Inc., d/b/a McLane/Northeast, McLane/Northeast-Concord, and McLane PA is a Texas corporation with its principal place of business in Temple, Texas. It is a wholly-owned subsidiary of McLane Company, Inc. During the Relevant Period, McLane/Eastern, Inc. directly purchased substantial amounts of Refined Sugar, including but not limited to Granulated Sugar, at artificially inflated prices from one or more of the Producer Defendants.

27.     Plaintiff McLane/Suneast, Inc., d/b/a McLane/Pacific, McLane/Southern California, McLane/Sunwest, McLane Sunwest, McLane/Suneast, and McLane Ocala is a Texas corporation with its principal place of business in Temple, Texas. It is a wholly-owned subsidiary

9

of McLane Company, Inc. During the Relevant Period, McLane/Suneast, Inc. directly purchased substantial amounts of Refined Sugar, including but not limited to Granulated Sugar, at artificially inflated prices from one or more of the Producer Defendants.

28.    Plaintiff McLane Ohio, Inc. is a Texas corporation with its principal place of business in Temple, Texas. It is a wholly-owned subsidiary of McLane Company, Inc. During the Relevant Period, McLane Ohio, Inc. directly purchased substantial amounts of Refined Sugar, including but not limited to Granulated Sugar, at artificially inflated prices from one or more of the Producer Defendants.

29.    Plaintiff McLane/Southern, Inc. is a Mississippi corporation with its principal place of business in Temple, Texas. It is a wholly-owned subsidiary of McLane Company, Inc. During the Relevant Period, McLane/Southern, Inc. directly purchased substantial amounts of Refined Sugar, including but not limited to Granulated Sugar, at artificially inflated prices from one or more of the Producer Defendants.

30.    Plaintiff McLane/Western, Inc. is a Colorado corporation with its principal place of business in Temple, Texas. It is a wholly-owned subsidiary of McLane Company, Inc. During the Relevant Period, McLane/Western, Inc. directly purchased substantial amounts of Refined Sugar, including but not limited to Granulated Sugar, at artificially inflated prices from one or more of the Producer Defendants.

31.    Plaintiff Kinexo, Inc. is a North Carolina corporation with its principal place of business in Rocky Mount, North Carolina. It is a wholly-owned subsidiary of McLane Company, Inc. During the Relevant Period, Kinexo, Inc. directly purchased substantial amounts of Refined Sugar, including but not limited to Granulated Sugar, at artificially inflated prices from one or more of the Producer Defendants.

10

32.     Plaintiff McLane Foodservice Distribution, Inc. f/k/a Meadowbrook Meat Company is a North Carolina corporation with its principal place of business in Rocky Mount, North Carolina. It is a wholly-owned subsidiary of McLane Company, Inc. During the Relevant Period, McLane Foodservice Distribution, Inc. directly purchased substantial amounts of Refined Sugar, including but not limited to Granulated Sugar, at artificially inflated prices from one or more of the Producer Defendants.

33.     Plaintiff McLane Foodservice, Inc. is a Texas corporation with its principal place of business in Temple, Texas. It is a wholly-owned subsidiary of McLane Company, Inc. During the Relevant Period, McLane Foodservice, Inc. directly purchased substantial amounts of Refined Sugar, including but not limited to Granulated Sugar, at artificially inflated prices from one or more of the Producer Defendants.

34.     Plaintiff PepsiCo, Inc. is a multinational corporation that manufactures, markets, distributes, and sells various beverages and foods with operations throughout the United States. PepsiCo, Inc. is a North Carolina corporation with its principal place of business in Purchase, NY. During the Relevant Period, PepsiCo, either by itself or through its subsidiaries and affiliates, purchased substantial amounts of Refined Sugar, including but not limited to Granulated Sugar, at artificially inflated prices from one or more of the Producer Defendants.

35.     Plaintiff Pepsi-Cola Advertising and Marketing, Inc. is a Delaware corporation with its principal place of business in Purchase, New York. During the Relevant Period, Pepsi-Cola Advertising and Marketing, Inc. directly purchased substantial amounts of Refined Sugar, including but not limited to Granulated Sugar, at artificially inflated prices from one or more of the Producer Defendants.

36.     Plaintiff SVC Manufacturing, Inc. is a Delaware corporation with its principal place of business in Chicago, Illinois. During the Relevant Period, SVC Manufacturing, Inc. directly purchased substantial amounts of Refined Sugar, including but not limited to Granulated Sugar, at artificially inflated prices from one or more of the Producer Defendants.

37.     Plaintiff Frito-Lay, Inc. is a Delaware corporation with its principal place of business in Plano, Texas. During the Relevant Period, Frito-Lay, Inc. directly purchased substantial amounts of Refined Sugar, including but not limited to Granulated Sugar, at artificially inflated prices from one or more of the Producer Defendants.

38.     Plaintiff The Quaker Oats Company is a New Jersey corporation with its principal place of business in Chicago, Illinois. During the Relevant Period, The Quaker Oats Company directly purchased substantial amounts of Refined Sugar, including but not limited to Granulated Sugar, at artificially inflated prices from one or more of the Producer Defendants.

39.     Plaintiff Quaker Manufacturing, LLC is a Delaware corporation with its principal place of business in Purchase, New York. During the Relevant Period, Quaker Manufacturing, LLC directly purchased substantial amounts of Refined Sugar, including but not limited to Granulated Sugar, at artificially inflated prices from one or more of the Producer Defendants.

40.     Plaintiff Bimbo Bakeries USA, Inc. ("Bimbo Bakeries") is the largest commercial baking company in the United States and sells baked products nationwide. Bimbo Bakeries is a Delaware corporation with its principal place of business in Dallas, Texas. During the Relevant Period, Bimbo Bakeries, either by itself or through its subsidiaries and affiliates, purchased substantial amounts of Refined Sugar, including but not limited to Granulated Sugar, at artificially inflated prices from one or more of the Producer Defendants.

41.    Plaintiff Bimbo Bakehouse LLC is a Delaware limited liability corporation with its principal place of business in Irving, Texas. During the Relevant Period, Bimbo Bakehouse LLC directly purchased substantial amounts of Refined Sugar, including but not limited to Granulated Sugar, at artificially inflated prices from one or more of the Producer Defendants.

42.    Plaintiff Bimbo Bakehouse Inc. is a Canadian corporation doing business in the United States. During the Relevant Period, Bimbo Bakehouse Inc. directly purchased substantial amounts of Refined Sugar in the United States, including but not limited to Granulated Sugar, at artificially inflated prices from one or more of the Producer Defendants.

43.    Plaintiff BB Global Investing Holding, S.L. is a Spanish corporation that merged with and assumed all assets of Bimar Europe Asset Management Private Limited Company f/k/a Bimbo Hungria Zrt. ("Bimbo Hungria"(, which directly purchased substantial amounts of Refined Sugar, including but not limited to Granulated Sugar, at artificially inflated prices from one or more of the Producer Defendants between January 1, 2019 and November 2022. During this time period, all purchases by Bimbo Hungria of Refined Sugar were made within the United States, all contracts and purchase orders of Refined Sugar by Bimbo Hungria were executed in the United States, all Refined Sugar invoices were addressed and sent to the United States, and all negotiations for the purchase price of Refined Sugar were handled by Bimbo Bakeries employees in the United States on behalf of Bimbo Hungria. Between January 1, 2019 and November 2022, Bimbo Hungria purchased Refined Sugar from Producer Defendants' facilities in the United States, which were shipped directly to Bimbo Bakeries locations throughout the United States.

44.    Plaintiff Grupo Bimbo, S.A.B. de C.V. is a Mexican corporation doing business in the United States. During the Relevant Period, Grupo Bimbo, S.A.B. de C.V., either by itself or through its subsidiaries and affiliates, purchased substantial amounts of Refined Sugar, including

but not limited to Granulated Sugar, at artificially inflated prices from one or more of the Producer Defendants.

### B.    Defendants

#### 1.  ASR Defendants

45.    Defendant ASR Group is a privately-held Florida corporation with its principal place of business at 1 North Clematis Street, Suite 200, West Palm Beach, Florida 33401. It is a global producer and seller of Refined Sugar. ASR Group owns five sugar refineries in North America, including three in the United States: Baltimore, Maryland; Chalmette, Louisiana; and Crockett, California.[9] ASR Group holds itself out as "the world's largest refiner and marketer of cane sugar with an annual production capacity of 6 million metric tons of sugar." It asserts that it sells its products to "customers in key channels, including grocery, industrial, foodservice and specialty." ASR Group is a subsidiary of the Florida Crystals Corporation and Sugar Cane Growers Cooperative of Florida, business enterprises of the global sugar empire, Fanjul Corp. ASR Group owns, as a subsidiary, Co-Defendant Domino Foods, Inc. ASR Group is vertically integrated and owns sugar processing, marketing, and sales companies in Canada, the United Kingdom, Portugal, Mexico, and Belize.

46.    Defendant ASR is a privately held Florida corporation and global producer and seller of Refined Sugar with its principal place of business in West Palm Beach, Florida.

47.    Defendant Domino is ASR Group and ASR's marketing and sales subsidiary for Refined Sugar, with a current principal place of business at 1 North Clematis Street, Suite 200, West Palm Beach, Florida. Domino distributes Refined Sugar to retailers under the United States-based brands Domino® Sugar, C&H® Sugar, and Florida Crystals®.

---

[9] ASR Group previously owned a plant in Yonkers, New York, which closed in 2025.

48.     Defendants ASR Group, ASR, and Domino are collectively referred to herein as "ASR/Domino."

49.     ASR/Domino markets most of its Refined Sugar under the Domino and C&H brand names but also sells sugar under the brand names Florida Crystals, Redpath, Tate & Lyle, Lyle's, Whitworths, and Sidul. It also sells sugar under various store brands.

### 2.  United

50.     Defendant United, a Minnesota corporation, is a marketing cooperative with its corporate headquarters in Edina, Minnesota. United has four member owners: (1) United States Sugar Corporation ("U.S. Sugar"), which owns and operates a cane mill and cane refinery in Clewiston, Florida; (2) American Crystal Sugar Company; (3) Minn-Dak Farmers Cooperative; and (4) Wyoming Sugar Company, LLC, all of which grow and process sugarcane or sugar beets at eight production facilities located in Minnesota, Montana, North Dakota, and Wyoming. United sells sugar under the United and Crystal Sugar brands, as well as the Imperial and Dixie Crystals brands, which were formerly Imperial brands before Imperial was acquired by United. It also sells sugar sold under various store brands.

51.     United touts that "[b]ecause United has a unique, fully integrated business structure, we provide and transport sugar throughout the nation. We have 9 sugar producing plants, primarily in the Red River Valley along the border of North Dakota and Minnesota. We also produce beet sugar in Montana and Wyoming, as well as cane sugar in the [sic] Florida and Georgia."[10]

52.     United sells Refined Sugar in bulk via truck and rail car. It also sells Granulated Sugar in various size packaging, including retail-size bags, 25-pound bags, 50-pound bags, and

---

[10] United Sugar Producers & Refiners, FAQs [https://unitedsugarpr.com/faq/] (last visited July 15, 2026).

super sacks of 2,000 pounds. United approaches the market as a unified competitor, marketing and selling all the Refined Sugar produced by its member owners. United handles locating customers, negotiating sales contracts, and arranging all logistics. United also sets the prices for all the products it markets and sells on its members' behalf.

### 3. Louis Dreyfus

53.    Defendant Louis Dreyfus is a Delaware corporation with its principal place of business in Wilton, Connecticut. In 2012, Louis Dreyfus acquired Imperial Sugar Company, which marketed and sold Refined Sugar produced at its sugar cane refinery in Savannah, Georgia.

### 4. Imperial n/k/a U.S. Sugar Savannah

54.    Imperial is a Delaware corporation with its principal place of business in Georgia. United States Sugar Savannah Refinery, LLC, a wholly-owned subsidiary of U.S. Sugar, bought Imperial from Louis Dreyfus on November 30, 2022.[11]

### 5. Michigan Sugar Company

55.    Defendant Michigan Sugar Company ("Michigan Sugar) is a Michigan corporation with its principal place of business in Bay City, Michigan. Michigan Sugar is owned by nearly 900 cooperative members who are farmers that grow sugar beets, which Michigan Sugar processes into Refined Sugar at its beet processing facilities in Bay City, Caro, Croswell, and Sebewaing, Michigan. Michigan Sugar boasts that it is the only remaining sugar company in Michigan.

### 6. Commodity Defendants

56.    Defendant Commodity is a Delaware corporation with its principal place of business at 560 South State Street, Suite E-2, Orem, Utah 84058.

---

[11] Ron Sterk, *U.S. Sugar Corp. finalizes Imperial deal*, Food Business News, (Nov. 30, 2022), https://www.foodbusinessnews.net/articles/22731-us-sugar-corp-finalizes-imperial-deal.

16

57.     During the Relevant Period, Commodity was a strawman entity and tool for Defendants to exchange CSI and otherwise conspire. Commodity had no public presence. It did not maintain a website on the internet. It did not advertise its services to the public. It did not publish publicly available reports on the sugar industry or offer to sell or provide any reports on or analysis of the sugar industry to other than a select few.

58.     Defendant Mr. Wistisen is the principal of Commodity who, as part of Defendants' unlawful agreement, collected and shared confidential, proprietary, and competitively sensitive non-public information between the Producer Defendants.

59.     Defendants Commodity and Mr. Wistisen are alter egos, and reference to one is a reference to both of them collectively.

60.     Throughout the Relevant Period, the Producer Defendants utilized Mr. Wistisen to facilitate the conspiracy and the exchange of confidential and proprietary CSI, regarding, among other things, prices, capacity, demand, sales volume, and other key production and pricing metrics in furtherance of the conspiracy. Throughout the Relevant Period, the Producer Defendants utilized Mr. Wistisen to implement, monitor, and/or enforce the conspiracy and the exchange of confidential and proprietary CSI.

### 7.  Agents and Co-Conspirators

61.     Various other persons, firms, and corporations not named as defendants have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy. Defendants are jointly and severally liable for the acts of their co-conspirators whether or not named as defendants in this Complaint.

62.     Whenever reference is made to any act of a corporation, the allegation means that the corporation engaged in the act by or through its officers, directors, agents, employees, or

17

representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

63.    Defendants are also liable for acts done in furtherance of the alleged conspiracy by companies they acquired through mergers, acquisitions, asset purchase agreements, or other business combinations.

## IV.    FACTUAL ALLEGATIONS

### A.    The Domestic Refined Sugar Market and its Commercial Development

64.    "Refined Sugar," as that term is used herein, refers to sugar that is extracted from sugar cane or sugar beets and processed to yield granulated white sugar, brown sugar, powdered sugar, and liquid sugar. Refined Sugar is considered the gold standard of sweeteners with a clean, pleasant sweetness and no secondary taste or aftertaste.

65.    Refined Sugar is made by extracting juice from sugar cane or sugar beet, processing the juice to remove impurities and to concentrate it into a thick syrup, boiling it until sugar crystals form, separating the sugar crystals from the syrup in a centrifuge, drying the sugar crystals with hot air, and grinding them to uniform size.

66.    While Refined Sugar derived from sugar cane is chemically indistinguishable from Refined Sugar derived from sugar beets, their manufacturing processes are slightly different. Sugar cane is first processed into "raw sugar" and subsequently shipped to a refinery to be further processed into Refined Sugar by washing and further removing remaining molasses and other non-sugar components. Sugar beets, on the other hand, are typically processed in a single facility where they are converted directly into Refined Sugar.

67.    Sugar cane and sugar beets are also grown in different climates. Sugar cane grows in semitropical or tropical climates. Thus, in the United States, sugar cane is produced in Florida

18

and the Southern areas of Louisiana and Texas. Sugar beets are sturdier crops that can grow in rotation with other crops and are grown in four primary regions encompassing the Great Lakes (Michigan), Upper Midwest (Minnesota and North Dakota), Great Plains (Colorado, Montana, Nebraska, and Wyoming), and Far West (Northern California, Idaho, Oregon, and Washington).

68.    Refined Sugar is predominantly sold in granulated form, including the familiar dry white Granulated Sugar that many households stock in their kitchens. Refined Sugar also may be modified into liquid sugar (by dissolving Granulated Sugar in water or, for a few liquid-only producers, by melting raw sugar), brown sugar (by adding molasses to Granulated Sugar), or powdered sugar (by pulverizing Granulated Sugar and adding corn starch). Granulated Sugar accounts for approximately 80 percent of all Refined Sugar sold.

69.    Refined Sugar is a common sweetener used in home-food preparation and cookbooks. Consumers tend to dislike any sugar substitute that does not match its sweetness profile. The USDA has previously reported that the average American consumes approximately 150–170 pounds of Refined Sugar per year. Accordingly, direct purchasers of Refined Sugar, including Plaintiffs, are unlikely to replace sugar with other sweetener products.

70.    Refined Sugar producers, either directly or via their marketing affiliates (*e.g.*, United and National Sugar Marketing ("NSM")), market and sell Refined Sugar to wholesale customers, including industrial food processors, retailers, and distributors such as Plaintiffs.

71.    The global sugar industry is massive. In 2023, the global industrial sugar market was $39.59 billion, and it is projected to grow to $50.76 billion by 2032. According to one study conducted by researchers at Texas A&M University, sugar production in the United States has an annual economic impact, including direct sales, indirect sales, and end user sales, of more than $23 billion.

72.    Refined Sugar is a commodity product with little or no product differentiation between producers. For example, futures contracts for domestic sugar are traded on the Intercontinental Exchange ("ICE") as "White Sugar" under the symbol "W", alongside other commodity products such as wheat, crude oil, and gold. Typically, when a product is characterized as a commodity, competition is based principally on price as opposed to other attributes such as product quality or customer service. The commodity nature of Refined Sugar helps to facilitate cartel behavior.

73.    Due to the lack of product differentiation, the Producer Defendants are forced to compete on price such that the pricing decisions of each Refined Sugar producer impact the market price for Refined Sugar.

74.    The domestic market for Refined Sugar has gone through significant consolidation in recent years, helping to facilitate cartel conduct. For instance, in 2019, United sought to acquire competitor Imperial Sugar. Subsequently, U.S. Sugar, one of the four member-owners of United, entered into an asset purchase agreement whereby U.S. Sugar would acquire Imperial, and United would market and sell all of the Refined Sugar produced by Imperial. In 2021, the DOJ sued to block the proposed merger (*United States v. U.S. Sugar Corp.,* 1:21-cv-01644 (D. Del.) ("Merger Litigation")), noting that the acquisition would leave the overwhelming majority of Refined Sugar sales across the Southeast in the hands of only two producers and would create higher prices for businesses and consumers. The merger was finalized later that year. United now boasts that it currently supplies approximately one quarter of the total United States sugar demand.

75.    Similarly, ASR, along with the Sugar Cane Growers Cooperative of Florida, acquired Defendant Domino in 2001. In 2005, ASR Group purchased domestic competitor California and Hawaiian Sugar Company ("C&H Sugar"), and in 2007, it acquired Jack Frost

20

("National Sugar Company"), and Redpath Sugar ("Tate & Lyle's Canadian sugar refining operations"). In 2010, ASR completed its takeover of Tate & Lyle's sugar business by acquiring their refineries in London, England and Lisbon, Portugal.

76.    Defendants, either directly or via their marketing affiliates, market and sell Refined Sugar to customers, including food and beverage manufacturers, distributors, retailers, and food service companies.

77.    Granulated Sugar, which is the key ingredient in all forms of Refined Sugar, is a commodity product with little or no differentiation based on the producer. Typically, the locus of competition for commodity products is on price instead of other attributes such as product quality or customer service. Because it is easier to coordinate prices among homogenous products, a commodity such as Granulated Sugar (and the resulting Refined Sugar products) is susceptible to cartel behavior.

78.    Because of the lack of product differentiation, competitors in the Refined Sugar market must compete on price; as such, the pricing decisions of each Refined Sugar producer can affect the market price for Refined Sugar.

### B.    The Relevant Market

79.    Because Defendants' agreement to artificially raise, fix, maintain, or stabilize prices of domestic Refined Sugar sold in the United States constitutes a per se violation of Section 1 of the Sherman Act, Plaintiffs are not required to define a relevant market or plead that Defendants possessed market power within such a market. Nevertheless, to the extent deemed necessary, Plaintiffs allege the following relevant product and geographic markets.

21

80.     The relevant market is Refined Sugar produced and sold to customers in the United States. In the alternative, the relevant market is Granulated Sugar produced and sold to customers in the United States.

### 1.   Refined Sugar is the Relevant Product Market.

81.     Refined Sugar is produced by (i) processing sugar beets or (ii) refining raw cane sugar. Refined Sugar produced from cane and beets is chemically identical and treated as interchangeable from the standpoint of customer requirements and purchasing decisions. Additionally, the United States Department of Agriculture ("USDA") regulates Refined Sugar produced from beets and sugar cane under the U.S. Sugar Program, without distinction.

82.     Refined Sugar is sold primarily as granulated refined sugar, but it may also be sold as liquid sugar, brown sugar, or powdered sugar. Granulated, liquid, brown, and powdered sugar are properly included within the same relevant product market because each is a refined sucrose product derived from the same underlying sugar supply and produced through closely related refining and processing operations.

83.     Manufacturers routinely convert Granulated Sugar into powdered sugar, brown sugar, or liquid sugar using incremental processing steps, and the same refining facilities commonly produce multiple forms of Refined Sugar. These variations are marketed to many of the same industrial and commercial customers, and are distributed through the same channels, and are frequently purchased pursuant to integrated supply arrangements. Demand for one form of Refined Sugar is therefore closely linked to the supply and provision of the others, such that competitive conditions affecting one form of Refined Sugar materially affect others.

84.     In its decision denying the DOJ's merger challenge in the Merger Litigation, the district court found that the relevant product market consisted of Refined Sugar as defined herein.

22

Merger Litigation, Dkt. No. 256 at 44 ("There is no dispute that the relevant product market in this case includes refined sugar in all forms (*i.e.*, granulated, brown, liquid, powdered) regardless of whether the sugar is derived from sugar cane or sugar beets."). In affirming the district court's decision, the Third Circuit observed: "[A]ll are agreed: the product is refined sugar." *United States v. U.S. Sugar Corp.*, 73 F.4th 197, 204 (3d. Cir. 2023). Notably, none of the parties to the Merger Litigation, including Defendant United, argued that Refined Sugar should be defined differently.

85.     Refined sugar is sold to, among others: (a) industrial users (food and beverage manufacturers and processors); (b) retail grocers/retail channels (including private-label and branded programs); (c) institutional users (restaurants, hotels, schools, and similar institutions), and (d) wholesale distributors, each of which purchases Refined Sugar as an input or resale product.

86.     An industrial food or beverage customer that uses Refined Sugar in its products is unlikely to switch to using another sweetener because it would require changing recipes, production methods, and product labeling.

87.     Similarly, grocery stores and other retail customers are unlikely to replace sugar on their shelves with other sweetener products because American households demand sugar for uses like baking cookies and sweetening coffee. Other kinds of sweeteners, such as high fructose corn syrup, and artificial sweeteners (for example, Stevia and aspartame), are not reasonable substitutes for Refined Sugar.

88.     One tool used to assess the extent to which products are substitutes, and thus whether they belong in the same market, is known as the "hypothetical monopolist" test. This test, as described in the Horizontal Merger Guidelines promulgated by the DOJ and Federal Trade Commission ("FTC"), asks whether a firm that is the only seller of a product (a hypothetical

monopolist) could profitably impose a price increase—specifically, a small but significant and non-transitory increase in price—on at least one product in the relevant product market.

89.    When the Defendants collectively raised prices for Refined Sugar, purchasers did not substitute to other products. Per USDA's Farm Service Agency, average monthly domestic human consumption of sugar sold via cane refiners in 2019, the first year *during* the Relevant Period, was 526,000 short tons, compared to average monthly domestic consumption of 518,000 short tons in the year *before* the Relevant Period, despite the fact that the price of Refined Sugar rose in 2019 as compared to 2018..[12] This is real-world evidence that a hypothetical monopolist of the sale of Refined Sugar could effectively raise prices of Refined Sugar by a small but significant and non-transitory amount because substitution away from Refined Sugar would be insufficient to make that price increase unprofitable. Accordingly, the sale of Refined Sugar constitutes a relevant product market.

**2.   In the Alternative, Granulated Sugar is the Relevant Product Market.**

90.    In the alternative to Plaintiffs' broader product market definition, Plaintiffs allege that the relevant product market is Granulated Sugar.

91.    Granulated Sugar is a refined, crystalline sucrose product sold in granule form (often referred to as "table sugar"), including without limitation Granulated Sugar sold in consumer packages and in commercial/industrial formats (e.g., bags and bulk shipments).

92.    Granulated Sugar has unique physical characteristics (dry crystalline granules) and functional properties that customers require for particular applications (including baking, dry-mix,

---

[12] Farm Service Agency, USDA, *Historical Sugar Sales by Type of Processor*, [https://www.fsa.usda.gov/documents/historical-sugar-sales-type-processor] (last visited July 4, 2026).

confectionery, and other uses that depend on granule size, flow properties, and dry blending behavior).

93.     Granulated Sugar is commonly treated by industry participants and purchasers as a commodity product with little or no differentiation by producer, such that competition is primarily based on price, delivered terms, and supply reliability.

94.     For the reasons set forth herein, the market for Granulated Sugar constitutes a distinct submarket because a hypothetical monopolist of the sale of Granulated Sugar could effectively raise prices of Granulated Sugar by a small but significant and non-transitory amount. This is so because substitution away from Granulated Sugar would be insufficient to make that price increase unprofitable. Accordingly, the sale of Granulated Sugar constitutes a relevant product market.

### 3.    The United States is the Relevant Geographic Market.

95.     The relevant geographic market is Refined Sugar, or alternatively Granulated Sugar,  produced and sold in the United States. As defined herein, the "United States" includes the territories of the United States and the District of Columbia. The United States constitutes a distinct geographic market for the production and sale of Refined Sugar because Refined Sugar is subject to substantial regulatory, logistical, and commercial constraints that limit arbitrage from foreign suppliers and segment domestic supply conditions from global markets. Imports of Refined Sugar into the United States are materially constrained by tariff-rate quotas, import licensing requirements, and other federal trade and agricultural policies that restrict the volume, timing, and price competitiveness of foreign Refined Sugar entering the U.S. market.

96.     As a result of these barriers, Refined Sugar sold in the United States is priced and distributed under conditions materially distinct from Refined Sugar sold outside the United States.

25

Domestic purchasers—including industrial food manufacturers, beverage producers, and other large-scale commercial buyers—are dependent primarily on domestically refined sugar sources, and cannot timely or economically substitute foreign-sourced Refined Sugar in response to a small but significant non-transitory increase in price.

97.    Due to the barriers described above, a hypothetical monopolist controlling the supply of Refined Sugar in the United States could impose a small but significant and non-transitory increase in price without losing sufficient sales to imports or cross-border substitution to render the price increase unprofitable. Accordingly, the United States constitutes the relevant geographic market.

98.    Refined Sugar, the bulk of which is sold as Granulated Sugar, is marketed and sold broadly to customers across the country, and purchasers can and do source Refined Sugar domestically, including purchases from refiners and distributors supplying broad geographic swaths of the country.

99.    Indeed, in the Merger Litigation, the district court and the Third Circuit on appeal accepted the proposition that the Relevant Market was the United States—a definition that the defendants in that litigation (including United) proposed.

C.    **Defendants Possess Market Power in the Relevant Markets**

100.    As demonstrated in Figure 1, the massive price hike beginning in 2019 over competitive levels is *direct* evidence that Producer Defendants collectively wield market power in the sale of Refined Sugar in the United States. These price hikes would not have been possible absent the Producer Defendants' collective market power. Courts and antitrust practitioners recognize that market power may be demonstrated through direct evidence. Market power may also be demonstrated through the presentation of indirect or circumstantial evidence. *In re Pork*

26

*Antitrust Litig.*, 781 F. Supp. 3d 758, 796 (D. Minn. 2025), *motion to certify appeal denied*, No. CV 18-1776, 2025 WL 3003979 (D. Minn. Oct. 27, 2025), and *reconsideration denied*, No. 18-1776, 2026 WL 674230 (D. Minn. Mar. 10, 2026).

101.   Producer Defendants' market power can be established *indirectly* from their collective share in the relevant market, which is protected by high entry barriers. Their market power is further supported by the structure of the industry, including (a) concentrated supply among a limited number of large sellers, including Producer Defendants; (b) limited demand-side substitution away from Refined Sugar in response to price increases; and (c) policy and quota mechanisms that restrict supply and limit the ability of imports to expand quickly enough to discipline domestic pricing.

102.   The structure of the United States Refined Sugar market is conducive to Producer Defendants' exercise of market power. The Refined Sugar market is characterized by a limited number of larger domestic producers and marketing cooperatives, including vertically integrated beet sugar processors and cane sugar refiners, that collectively supply a substantial share of domestic Refined Sugar consumption.

103.   During the Relevant Period, Producer Defendants collectively controlled a majority of the domestic market for Refined Sugar. According to an analysis conducted by U.S. Sugar, in 2020, Producer Defendants controlled 70% of the domestic Refined Sugar market.[13] The Producer Defendants have even acknowledged their dominant position. For instance, upon hearing the

---

[13] Public Joint Appendix Vol. IV (JA1230-JA1491), Slide deck titled "US Sugar Market As it relates to Seine" dated Feb. 2020 (JA1363), *United States v. U.S. Sugar Corp., et al.*, No. 22-02806 (3d Cir. 2023), Dkt. No. 42, at 151.

announcement of Imperial Sugar's acquisition by United, one Producer Defendant noted that "they view this as 1 less competitor and now 3 companies account for 75% of the market."[14]

104. The 2024 estimated market share of each Producer Defendant by capacity is shown in Figure 2 below. Collectively, the Producer Defendants controlled an estimated market share of 72%.

| Marketing Entity | Refining Entity | Capacity (cwt) | % Share |
|---|---|---|---|
| Domino Foods, Inc. | American Sugar Refining, Inc. | | |
| | Chalmette, LA | 20,500,000 | |
| | Baltimore, MD | 16,500,000 | |
| | Crockett. CA | 17,000,000 | |
| | Yonkers, NY | 12,250,000 | |
| | Florida Crystals Corp. - South Bay, FL | 6,600,000 | |
| | Total | 72,850,000 | 30% |
| United Sugar Cooperative | American Crystal Sugar Co. | 40,000,000 | |
| | U.S. Sugar Corp. – Clewiston, FL | 18,000,000 | |
| | U.S. Sugar Savannah Refinery - Savannah, GA | 18,600,000 | |
| | Minn-Dak Farmers Co-op – Wahpeton, ND | 9,600,000 | |
| | Wyoming Sugar Co. - Worland, WY | 1,100,000 | |
| | Total | 87,300,000 | 36% |
| National Sugar Marketing LLC | Amalgamated Sugar Co. | | |
| | Snake River Sugar Co. | 23,500,000 | |
| | Southern Minnesota Beet Sugar Cooperative | | |
| | Renville, MN | 10,100,000 | |
| | Brawley, CA | 3,350,000 | |
| | Total | 36,950,000 | 15% |
| Cargill, Inc. | Louisiana Sugar Refining LLC - Gramercy, LA | 20,000,000 | 8% |
| Michigan Sugar Co. | Michigan Sugar Co. | 14,500,000 | 6% |
| Western Sugar Cooperative | Western Sugar Cooperative | 12,000,000 | 5% |
| Grand Total | | 243,600,000 | |

Figure 2

105. New entrants face high barriers to entry and expansion in the market for Refined Sugar. Building, permitting, and operating Refined Sugar production and refining capacity requires substantial capital investment, specialized facilities and know-how, reliable access to raw inputs,

---

[14] Attachment to Motion for Protective Order by American Sugar Refining, Inc. [Redacted], Email from ASR/Domino's Adam Whittaker dated Mar. 25, 2021, *United States v. U.S. Sugar Corp.*, No. 21-cv-1644-MN (D. Del. Apr. 18, 2022), Dkt. No. 207-24, at 2.

and extensive logistics and storage infrastructure—conditions that prevent timely, sufficient entry or expansion that would defeat a coordinated price increase.

106. Most sugar processors in the United States are vertically integrated, thereby streamlining operations, consolidating to accelerate economies of scale, and expanding profit. As a result, profit tends to be higher than in other agricultural industries. New entrants face structurally higher cost bases relative to established vertically integrated sugar producers.

107. Deeply embedded supplier relationships with major food and beverage customers present another barrier to entry. The major sugar producers maintain large product portfolios with high brand loyalty, and these companies are preferred suppliers to the country's primary food and beverage processors and wholesale markets.

108. Further, geographic and climate constraints significantly limit where market entrants can establish operations. Sugarcane requires consistently warm, humid conditions, ample sunshine, and reliable water, thriving in tropical to subtropical zones. Frost risk or prolonged cool periods sharply reduce growth and sucrose accumulation, ruling out most U.S. latitudes for commercial-scale farming. These biology-driven limits confine production mainly to Florida and Louisiana. The location of the mill influences the quality of the sugarcane available for crushing because sugarcane and sugar beet are highly perishable inputs.

109. In addition to ordinary industrial barriers, Refined Sugar supply is materially affected by U.S. trade and agricultural-policy administration. The United States maintains tariff-rate quotas ("TRQs") for imports of Refined Sugar (among other sugar categories), and the administration of TRQs and related mechanisms limits the ability of imports to constrain supracompetitive domestic pricing.

29

110. Under federal law, increases to the Refined Sugar TRQs are tied to specified conditions (including emergency shortage circumstances and findings that domestic marketing and refining capacity have been maximized), further limiting the speed and magnitude with which imports can discipline domestic supracompetitive pricing.

### D. Defendants' Unlawful Conduct

#### 1. Defendants Unlawfully Shared Confidential Price and Sales Information With Each Other.

111. Since at least January 1, 2019, Defendants and their co-conspirators agreed, combined, or conspired to artificially raise, fix, maintain, or stabilize prices of domestic Refined Sugar in the United States. To facilitate their unlawful contract, combination, or conspiracy, Producer Defendants knowingly engaged in the mutual and reciprocal sharing of CSI with each other, including through Commodity. This regular reciprocal information exchange has taken place for years. There is no unilateral economically rational reason for the Producer Defendants to share such information. In the absence of an agreement or understanding, sharing such information would pose a competitive risk to any individual Defendant. This information was shared, however, for the purpose of enabling Defendants to effectuate their agreement to artificially affect prices and avoid competing with one another.

112. The Producer Defendants used Commodity and others to facilitate the price-fixing conspiracy. Commodity purports to analyze the sugar industry. Yet Commodity has no public presence. It does not maintain a website on the internet. It does not advertise its services to the public. It does not publish publicly available reports on the sugar industry or offer to sell or provide any reports on or analysis of the sugar industry to other than a select few. Moreover, Commodity does not gather information through voluntary surveys or periodic polling that it anonymizes. Instead, the Producer Defendants regularly shared CSI about their pricing and recently sold

30

positions with Commodity, and Commodity in turn contemporaneously shared that CSI with the other Producer Defendants.

113.    Furthermore, Commodity did not share or offer to share this CSI with the customers of the Producer Defendants or others in the Refined Sugar supply chain, nor did it publicly publish the CSI it obtains from and shared with the Producer Defendants or otherwise make it available to consumers, thereby strengthening the advantage that the Producer Defendants gain by sharing information only with one another as producers.

114.    The Producer Defendants understood that the information they provide to Commodity is CSI that would not ordinarily be disclosed to competitors. Sharing such CSI would be detrimental to their business interests were it not for the existence of a price-fixing conspiracy. The purpose of their sharing was to enable Producer Defendants to raise, fix, maintain, stabilize, or coordinate prices of Refined Sugar in the United States and to destroy the independent centers of decision-making the antitrust laws were designed to protect.

115.    Using the non-anonymized CSI exchanged through Commodity, the Producer Defendants ensured that they could enforce the conspiracy and not undercut each other's prices or cause prices to decrease as they would in a competitive market. The Producer Defendants learned of each other's current pricing, future beliefs on pricing, and recently sold positions only because Commodity collected this CSI from each of them and shared it with the others pursuant to their unlawful agreement.

116.    Dirk Francis Swart, United Sugar's executive vice-president, testified that United shared information with Mr. Wistisen because United "**know[s] he's going to share information and we want the information that gets shared to be accurate**." (emphasis added).

31

117.    ASR/Domino has a written code of conduct with an ethics policy that prevents any ASR/Domino employee from directly talking about ASR/Domino's pricing with a representative of one of ASR/Domino's competitors. Nevertheless, ASR/Domino employees did exactly this through Mr. Wistisen, knowing that he would provide the information to other competitors.

118.    The information voluntarily given to Commodity by each of the Producer Defendants includes the companies' current pricing, future or forward pricing, pricing strategies, sold positions, spot prices, contract prices, crop yields, and crop size.

119.    Commodity then gave this CSI to the Producer Defendants promptly, often within hours of having received it. The Producer Defendants then used the information they received from Commodity when deciding how much to set the price for Refined Sugar. Commodity often shared this inter-competitor CSI regarding the pricing and supply of Refined Sugar sold to customers on the spot market (the market for immediate delivery or delivery within a short period). Sharing this CSI has a direct effect on future Refined Sugar pricing agreements with customers because a futures contract price is commonly determined using the spot price of the commodity as a baseline.

120.    The sharing of CSI between the Producer Defendants thus enabled them to artificially raise, fix, maintain, or stabilize the prices at which Refined Sugar was sold to their customers pursuant to their anticompetitive agreement. Knowing each other's sold positions enabled the Producer Defendants to be more aggressive with pricing.

121.    As noted below, similar conduct by earlier producers of Refined Sugar led to a consent decree in 1978 that forbade such information exchanges by competitors.

122.    Due to USDA production allotments linked to USDA loan programs and limitations on imports and tariffs, the Producer Defendants know that as they sell out of Refined Sugar, they can charge higher prices because there will be little to no additional competitive product available

32

in the market that could force them to reduce price. Thus, knowing their horizontal competitors' sold position allows a Producer Defendant to manipulate the availability of supply in the market, thereby permitting them to raise, fix, maintain, or stabilize prices.

123. Furthermore, as market leaders, the Producer Defendants account for the majority of Refined Sugar production and sales. As a result, smaller market participants are not an effective competitive constraint on Producing Defendants' dominance.

124. The mutual, reciprocal exchange of pricing, crop size and yield, and sold position information by the Producer Defendants was intended to ensure—and did ensure—higher prices for Refined Sugar than would have existed in a competitive market unaffected by the Defendants' anticompetitive agreement.

125. In addition to sharing of CSI through Commodity, Wistisen, and others, the Defendants participated in trade association meetings that provided them with opportunities to collude and agreed to set price ranges based on the commodity spot prices as also discussed below.

126. In connection with the Merger Litigation, direct evidence of conspiratorial communications sharing CSI was made public. Excerpts of inculpatory communications follow:

127. A September 16, 2019 email communication to Mr. Wistisen from ASR/Domino's Vice President of Industrial Sales, Alan Henderson, disclosed ASR/Domino's 2020 pricing and sold positions. Mr. Wistisen asked Mr. Henderson, "Wondering where you would put refined prices and coverage?" Mr. Henderson responded "Pricing for FY20: Northeast - $38.50 bulk basis Gulf - $36.50 bulk basis West - $39.00 bulk basis Cane refiners should be close to 70 to 75% covered for FY20. The open business that does remain will be at higher prices."

128. ASR/Domino disclosed this CSI knowing it would be shared with its competitors, and in return, that it would get its competitors' CSI. Mr. Wistisen responded that he would send

33

crop and pricing updates in the next day or two, and noted, "The price updates I did receive today didn't have nearly the level of cane price increases you reported . . . but I bet they're headed that way[.]"

129.    Commodity was not the only conduit of information between the Producer Defendants during the Relevant Period. On November 15, 2019, Gerald Kramer of Kramer Brokerage Co. shared Domino price quotes with multiple Louis Dreyfus managers, and inventory details, writing: "[a]lso told that Domino still has sugar to sell." In response, Jim Evans, National Sales Manager at Louis Dreyfus, expressed his appreciation: "This is very helpful!" Jeana Hines, Vice President of Sales & Marketing at Imperial, in the same email chain, asked Gerald Kramer, "Have you heard anything on what Domino is doing with pricing for their grocery retail business?" Kramer responded, "Domino will not sell any 50# EFG below $24.00/50# fob refinery thru 2020 for end users and only thru 12/31/19 for distributors. If I get any info on retail business I will pass it on."

130.    On January 8, 2020, Robert Sproull, Senior VP of Sales Marketing and Product Development at ASR/Domino, emailed Mr. Henderson that "it's really important we signal to the market that there's still going to be tightness," and "[w]e need to signal to the market that we're going to maintain price, especially for the Oct-Dec quarter. And there's not much to lose here. Pure price discovery."

131.    On March 3, 2020, Mr. Henderson sent an email regarding "Colloquium Recap" to Mr. Sproull, which contained a "summary of points from the International Sweetener Colloquium," including "Competitive Numbers" for fiscal year 2021 for certain competitors, including "Michigan firm at $38.50 for 2021," "United took prices up to $36.50 FOB RRV pre colloquium to the trade and heard it from specific customers," "Clewiston - $37.50 FOB bulk," "NSM - still

34

offering sugar in FY20. Values close to 43.00/44.00 fob factory, 46.00/47.00 fob west coast transfer stations," "Imperial - 38.00/38.50 for CY 2021 on bulk EFG."

132.    The Producer Defendants provided accurate information to each other through Mr. Wistisen. ASR/Domino was typically "upfront" about the information it provided to Mr. Wistisen. In one example of such "upfront" information, Mr. Henderson disclosed to Mr. Wistisen in an August 2020 email pricing updates for ASR/Domino's Refined Sugar. On August 17, 2020, Mr. Wistisen wrote to Mr. Henderson, providing him with sugar market updates and asked: "Where would you put cane prices and coverage?" The next day, August 18, Mr. Henderson responded:

> [ ... ]
> Quick Update:
> Pricing:
> Northeast - $39.00 to $40.00 BULK FOB
> South - $37.50 to $37.75 Bulk FOB - fighting Cargill mainly
> West - $39.50 to $40.00 Bulk FOB - values staying strong ...
> Cane gulf still fighting for share - but some talk of Cargill moving
> prices up to $37.50 gross fob.
> Coverage:
> Beets - 70 to 75%
> Cane - 50 to 55%
> [ ... ]

133.    Moreover, Mr. Wistisen told Defendants that he was speaking with United, ASR/Domino, and other sellers, and that the information he provided came directly from them. For example, Mr. Wistisen wrote to United that "ASR saying back up to $40.50 to $41," on one occasion; and on another he wrote to Mr. Henderson that "the United [pricing and sold position] info I provided was direct from them this morning. They held a big huddle yesterday (sounded like all sales reps/VP were present), and those numbers were the result." When discussing pricing, he stated that he did not have Michigan pricing yet, but "I hope to talk with them on Fri./Mon."

134.    Similarly, Mr. Wistisen shared Michigan Sugar's pricing and sold positions with United and ASR/Domino. In August 2020, he reported to Mr. Henderson at ASR/Domino, "My

goodness, what a difference a month makes. Michigan 85+% booked[.]" The next month, Mr. Wistisen reported, "Michigan holding forecasts unchanged, sugars nearing 16%, factories running well, stockpiling on Oct. 19th." Regarding pricing, he added that Michigan was at "$38.5+, selective selling."

135.    Mr. Wistisen often provided information on pricing and sold positions of competitors to the Producer Defendants shortly after having received it. On September 21, 2020, Mr. Wistisen separately asked, within minutes, Mr. Henderson and Eric Speece, a Director of Strategic Accounts at United, if there was "[a]nything new of interest on the pricing front?" They each responded with their company's respective pricing and sold positions. Mr. Speece shared, "We are firm at $36.50 (no change) and now $38.50 on cane (an increase of $0.50/cwt) and yes you heard correctly we are 90+% sold." In response, Commodity thanked United "for keeping the communication lines open!"

136.    On September 22, 2020, Mr. Henderson responded:

Pricing (Cane)

North and mid-Atlantic - $40.50 to 41.00 FOB - prices were lower past few weeks but have firmed up to these levels. No discounting at this time.
Gulf - $38.50 fob

West - $40.50 to $41.00 fob firm

Note - higher levels for the Oct./Dec. 20 period as most cane and beet companies are well sold and/or filling past force majeure volume.

I'm hearing most cane guys 70 to 75% booked with the exception of Cargill at 90%??
Beet prices below seem accurate and coverage at 90% I believe is about right.

137.    ***Less than three hours after receiving Mr. Henderson's response***, Mr. Wistisen passed the information he had received from each to the other minutes apart. To ASR/Domino, Mr. Wistisen wrote that "U.S. Sugar recently increased to $38.50, so looks like the range is $38.50 to

36

$41, nice increase over last month. Beet not much change from earlier indications, prices are $36.50 to $38. 75, very little sugar available at the low price, industry coverage 87%, all but NSM over 90+% booked." And to United, Mr. Wistisen wrote, "ASR saying back up to $40.50 to $41. So now I have cane range at $38.50 to $41 Coverage . . . ASR 5% below that, and the other southern refiners up 10-15% from the average . . . Waiting for confirm from Michigan, but Midwest ranging from $36.50 to 38.75, very little available at low price (so I hear)."

138.    In yet another example, Mr. Wistisen emailed both Mr. Speece at United and Mr. Henderson at ASR/Domino within approximately 40 minutes of each other in mid- November 2020 asking, "where would [they] put ... prices?" Both responded later that day with pricing information.

139.    On November 16, 2020, Mr. Wistisen wrote to Mr. Henderson at ASR/Domino, asking: "Curious what you're hearing on domestic raw and refined pricing? I haven't heard back from United yet. Did they pullback from spot market? Where would you put prices and cane coverage?" This exchange is shown diagrammatically in Figure 3 below, with Mr. Wistisen leading off the conversation in the top row.



Figure 3

140.    Mr. Wistisen received a response from Mr. Henderson on ASR Pricing and inventory later that day, as shown in the second row of the right column: "Prices have firmed up again based on higher # 16 values, beets close to sold out and less imports, tier 2 sugar available at this time. Near-by values back up to $46.00 FOB all locations. For calendar 2021: East/West-$42.00 fob[;] Gulf-$39.50 fob[;] Cane Coverage - 85-90%[.]" On November 17, 2020, after receiving a response from United, Mr. Wistisen responded to Mr. Henderson, as shown in the third row of the right column: "So strange, I can't wrap my head around United's approach. They came up very short on production, and market has firmed, but they're still at $36.50 RRV and $38.50 Southeast?!?! But did say they'll probably be taking prices higher given strong sold position . . . Waiting to hear back from a number of contacts." Mr. Wistisen also communicated the ASR pricing and inventory information to United on November 17, as shown in the third row of the left column.

38

141.    On February 15, 2021, Mr. Wistisen wrote to Mr. Speece at United: "Any action in FY22? Has United put a number on it yet? No word back from other processors/refiners, I'll send along indications." Mr. Speece quickly responded: "We are still at the $36.50 and $38.50 with zero problems selling at those values. I do not anticipate any changes to our prices, but we have not formally decided. No action on 2022 just some small inquiries." Mr. Wistisen asked: "Just to clarify: United has not issued FY22 list prices, and at this point doesn't expect FY22 prices to change much from remainder FY21?" On February 16, 2021, Mr. Speece answered: "Give me a ring and we can discuss."

142.    The next day, February 17, 2021, Mr. Wistisen wrote to ASR/Domino: "Long conversation with United: won't set FY22 price list until March, but the plan remains to hold steady at $36.50 and $38.50[.]"

143.    Upon receiving the news that Imperial's sugar would be "marketed by United," Adam Whitaker, the Director of Domino Foods observed: "It's going to be more important than ever to stay close to United. To the point where we might want to start thinking about ways to work with them (*i.e.*, asking them for quotes [REDACTED]), on down the road. This is setting up to smell a bit like ADM/Cargill in the corn sweetener industry. 2 players that account for ~65% of the industry . . ."

144.    On June 17, 2021, Mr. Wistisen emailed Mr. Henderson an update on crops and asked, "What are you seeing on the price and demand side of things?" Mr. Wistisen then explained:

I'm just getting going on pricing, but have heard a bit:

NSM: 35-36 net RRV, 37 net West. Claiming to be close to sold out at Brawley, 70% Renville, but only 40% booked Amalgamated.

United reportedly (I'll talk with them tomorrow) holding $36.50 gross, bigs are booking and getting discounts of about a buck or less, that's less than last season. Western supposedly (I'll talk with them tomorrow) increased prices to

39

$36.50 net, not getting many takers.

No talk on Michigan, yet. I hope to talk with them Fri/Mon.

Cane: I'm hearing Cargill is really chasing prices lower, a few deals under $37gross. And that Southeast has slipped below $38?

But that ASR is holding firm on the coasts.

145.    The next day, Mr. Henderson responded:

"Word on the street [was] United moving up a $1.00 cwt since bookings now over 60%."

He went on to share future prices for the 4th quarter of 2021:

"Cane prices firming up as #16 values rise.

Oct.- Dec. 21

East/West coasts ·- $44.00 gross fob bulk basis

Gulf - $42.00 gross fob bulk basis

Jan.- Dec. 22

East/West - $42.00 gross bulk basis

Gulf - $39. 75 gross fob bulk basis."

146.    On July 12, 2021, Mr. Wistisen reported to Mr. Henderson new pricing and inventory details: "Michigan and Western 80+% [booked], and rumors suggest United is also now around 80% booked and recently increased prices (I hope to have confirmation soon). Hearing NSM still a bit aggressive, at least into Texas." In the same email, Mr. Wistisen asked, "What's happening on the cane side of the fence? Sounds like you're now $48 spot, and Imperial $49. Where would you put forward pricing and coverage?"

147.    That same day, Mr. Henderson responded by updating Mr. Wistisen on ASR/Domino's pricing details: "Our pricing for remainder of FY21 is $48.00 bulk basis all

40

locations. With raws remaining high in the Oct./Dec. 21 period we are $46.00 fob bulk basis east/west and $44.00 gulf. For FY22 close to 65% booked and moving prices up. I haven't officially seen a United price increase but heard it's out there (+$2.00)."Additionally, on the same day, Mr. Henderson forwarded Mr. Wistisen's message to coworkers, saying, "FYI below ......... United price increase. Rich is thinking $2.00 increase but no official word yet. Let's see if we can hunt something down."

148.   On July 16, 2021, Mr. Wistisen wrote to ASR/Domino: "I don't understand it, but this is the word from United: 80-85% sold, will be at 90 very soon. Beet holding at $36.50 firm, and cane increased to $39.50 firm . . . Any changes in ASR forward prices? I have you at $39.75 gulf and $42 coasts." Later, Mr. Wistisen added: "Well at least one group, your group, has their finger on the pulse of this market. The United info I provided was direct from them this morning. They held a big huddle yesterday (sounded like all sales reps/VP were present), and those numbers were the result."

149.   Also on July 16, 2021, Mr. Henderson updated Mr. Wistisen on ASR's pricing: "We are now $40.50 gulf, $43.00 fob east and west coast."

### 2. Defendants Relied Upon the Competitively Sensitive Information Exchanged to Further Their Price-Fixing Conspiracy.

150.   The Producer Defendants used the information they received from Commodity to further their price-fixing conspiracy—not only to confirm the pricing of their competitors through the receipt of information from Commodity, but also to send messages to their competitors through the sharing of CSI with Commodity. For example, on January 8, 2020, Robert Sproull, Senior Vice President of Sales & Marketing at ASR Group, forwarded pricing information from Mr. Wistisen to Mr. Henderson at ASR/Domino and stated; "it's really important we signal to the market that there's still going to be tightness," and "[w]e need to signal to the market that we're going to

41

maintain price, especially for the Oct-Dec quarter. And there's not much to lose here. Pure price discovery."

151.    On March 3, 2020, Mr. Henderson sent an email regarding "Colloquium Recap" to Mr. Sproull, which contains a "summary of points from the International Sweetener Colloquium," including "Competitive Numbers" for fiscal year 2021 for certain competitors, including "Michigan firm at $38.50 for 2021," "United took prices up to $36.50 FOB RRV pre colloquium to the trade and heard it from specific customers," "Clewiston - $37.50 FOB bulk," "NSM - still offering sugar in FY20. Values close to 43.00/44.00 fob factory, 46.00/47.00 fob west coast transfer stations," "Imperial -38.00/38.50 for CY 2021 on bulk EFG."

152.    In another example, United's Mr. Speece thought a competitor was selling at too low a price, so he told his colleagues that United "may want to communicate pricing earlier than the colloquium to send a msg [message]."

153.    ASR/Domino's Mr. Henderson frequently forwarded the CSI obtained about other competitors from Mr. Wistisen to his sales team and his superior. In one such example, Mr. Henderson received, and forwarded to his subordinates, information from Mr. Wistisen's email on May 18, 2021 that he "[j]ust talked to United" and to "expect big action over the next month" and "at that time expect to raise prices and not by just a dollar[.]"

154.    United not only received information from Mr. Wistisen that it used in pricing decisions and to send messages about pricing to competitors, but also affirmatively used him to signal competitors. In one example, United's Executive Vice President, Dirk Swart, told United's Mr. Speece that he wanted Mr. Wistisen to "hear" that United's current beet sugar price was $36.50 and cane sugar price was $38, but United was contemplating increasing its prices given its sold

position. They discussed what they wanted to "indicate" to Mr. Wistisen before deciding to continue the conversation by phone.

155. United's Mr. Swart testified that United wanted "better information about what [United's] Competitor's actual prices were" to avoid "destructive situations" in which customers had access to enough pricing information to negotiate better prices.

\* \* \*

156. There is no plausible, non-conspiratorial justification for the Producer Defendants to use Commodity and/or other means to secretly share highly confidential and proprietary detailed information about their current and future prices and sold positions. In a competitive market, such proprietary CSI would be a closely guarded secret. Accordingly, sharing such proprietary CSI would not be in Defendants' economic self-interest in the absence of an unlawful agreement.

157. Defendants knew and intended that their private exchanges of CSI about prices and sold positions would allow them to artificially raise, fix, maintain, or stabilize Refined Sugar prices above the levels that would have existed absent the anticompetitive conduct alleged herein.

158. The Producer Defendants are interested in achieving higher prices for Refined Sugar. In one instance, United raised prices in part to "send[] a message" to its competitors "that we were not interested in allowing the market to slip lower." United's CEO Matthew Wineinger testified that he was "confident" that "word got back" to United's competitors.

159. ASR/Domino similarly anticipated competitive reactions, used pricing to send signals to competitors, and considered how its actions may cause market prices to decline.

160. ASR/Domino decided not to get "aggressive" on pricing because ASR/Domino "would like to avoid sending a signal out to competitors that we are chasing business and lowering pricing." ASR/Domino also wanted to "signal to the market" that there would be tightness and

ASR/Domino would "maintain price." ASR/Domino believed that after United' acquisition of Imperial, "[i]t's going to be more important than ever to stay close to United" and "[t]his is setting up to smell a bit like ADM/Cargill in the corn sweetener industry. 2 players that account for ~65% of the industry."

### 3. Defendants Agreed on a Common Formula to Fix Prices.

161. The Defendants developed and agreed upon standardized pricing formulas to fix the prices of Refined Sugar. For example, one of their formulas relied on publicly observed benchmarks, such as prices of futures contracts for U.S. raw cane sugar, known as "Number 16" traded on the Intercontinental Exchange ("ICE"), to coordinate their pricing strategies and maintain artificially high price levels. As raw sugar cane is a key cost driver for refined cane sugar, the price of raw sugar influences the price of Refined Sugar in the United States. This approach allowed Defendants to obscure their collusion under the guise of market-driven practices while avoiding competitive pressures.

162. The Producer Defendants frequently referenced "Number 16" spot prices to set their prices. For example, between February 15 to February 17, 2021, Mr. Wistisen reported to United's Eric Speece that sugar prices were likely to increase thanks in part to "the history of excellent selling restraint/patience from ASR, [and] high no. 16 prices . . ." After speaking with United, Mr. Wistisen subsequently emailed ASR/Domino's Vice Present of Industrial Sales Alan Henderson on February 17, 2021, relaying that he had a "[l]ong conversation with United" which planned to remain steady on price based in part on "No. 16," and that "looking down the road [United was] expecting another year of tight quotas in FY 22."

163. Similarly, in July 2021, Mr. Henderson referenced United's impending $2 price increase for beet sugar, emphasizing that it "makes sense if they follow the # 16 market and do the

math." Mr. Henderson later acknowledged that ASR/Domino was actively "pricing off #16 market," and that United mirrored this strategy, raising its Gulf FOB price to precisely match ASR's price of $40.50. United's executives admitted that this increase followed a "big huddle" among their marketing team, a clear signal of coordinated decision-making.

164. This agreement to rely on shared pricing formulas is a *per se* violation of the Sherman Act. The Producer Defendants ensured their price-fixing conspiracy by eliminating the unpredictability inherent in truly competitive markets.

**4.  Sugar Prices Increased in Parallel During the Relevant Time Period.**

165. The price of Refined Sugar rose significantly during the Relevant Period as a result of Defendants' conduct, and by more than a competitive market would have allowed.

166. Moreover, Refined Sugar price increased dramatically during the Relevant Period without a decline in the supply of Refined Sugar. U.S. beet and cane sugar production increased from 8,999,000 short tons in 2018/2019 to 9,397,000 short tons in 2024/2025.

167. Between fiscal year 2014/2015 to the present, there has been a relatively stable trend in the supply of U.S. beet and cane sugar production.



Figure 4

168.    Despite an increase in beet and cane sugar production between 2019/2020 and a stable supply since then, the price of Refined Sugar increased during the Relevant Period. The average spot price of refined beet sugar in the Midwest increased by more than 37% from $0.36 per pound f.o.b. in 2019 up to $0.51 per pound f.o.b. in 2024. Similarly, the average price of refined cane sugar in the Northeast increased by more than 57% from $0.38 per pound f.o.b. in 2019 to $0.60 in 2024. The price of Number 16 futures contracts for U.S. raw cane sugar also experienced an upward trend from an average price of $0.26 in 2019 to nearly $0.40 in 2024. Between 2019 and 2024, the Producer Price Index ("PPI"), an economic metric calculated by the U.S. Bureau of Labor Statistics that tracks the price changes for goods and services, for Refined Sugar increased from 171.60 to as high as 266.03 in 2024. Given the initial increase in supply in 2019/2020 and the stable supply since then, there was no economic rationale for the rate of price increases.

169. Moreover, many of the price increases at issue occurred after International Sweetener Colloquium ("ISC") meetings, when participants had an opportunity to coordinate with one another, including pricing for the next upcoming year. Defendants' communications with Mr. Wistisen further evidenced their parallel pricing. For example, Defendants held similar prices "firm" in parallel, which is another way of saying they would not be discounting to take market share.

170. In 2018, the opening offers beet sugar contracts for the 2018-19 season were between $0.33 to $0.35 per pound f.o.b. in the Midwest.

171. Between February 24 and February 27, 2019, industry participants attended the ISC meeting in Florida. After the ISC meeting, in April 2019, beet processors held offers firm for 2019-20 season at around $0.35 per pound f.o.b. in the Midwest and indicated that they had no intention of dropping 2019-2020 offers. Buyers who had paid beet sugar prices in the low 30 cents extending back to 2017 were reportedly shocked at a $0.02 to $0.03 per pound increase.

172. The average price of refined cane sugar in the Northeast jumped from $0.37 per pound f.o.b. in February 2019 to $0.42 per pound f.o.b. in November 2019. By November 2019, ASR/Domino was offering its cane sugar on the spot market at $0.44 per pound f.o.b. from all of its refineries.

173. In December 2019, early offers for beet sugar contracts for the 2020-21 season were between $0.36 and $0.38 per pound f.o.b. from the Midwest. In February 2020, bulk Refined Sugar prices were reportedly at seven-year highs.

174. In 2020, the ISC meeting was again held in late February. Soon after the end of the ISC meeting, on March 3, 2020, ASR's Mr. Hendersen sent an internal email to ASR's Mr. Sproull regarding "Colloquium Recap," summarizing "points from the International Sweetener

Colloquium," including "Competitive Numbers" for fiscal year 2021 for certain competitors, including "Michigan firm at $38.50 for 2021," "United took prices up to $36.50 FOB RRV pre colloquium to the trade and heard it from specific customers," "Clewiston - $37.50 FOB bulk,"

175. "NSM - still offering sugar in FY20. Values close to 43.00/44.00 fob factory, 46.00/47.00 fob west coast transfer stations," "Imperial - 38.00/38.50 for CY 2021 on bulk EFG." Following the February ISC meeting, in March and April 2020, beet processors offered beet sugar between $0.36 per pound f.o.b. to $0.38 per pound f.o.b. in the Midwest for the 2020-21 season. Indeed, Michigan Sugar offered its beet sugar for $0.38 per pound f.o.b. for 2021 while ASR/Domino offered refined cane sugar for $0.41 per pound f.o.b. from all of its refineries. Prices for spot bulk refined sugar also increased from $0.44 per pound f.o.b. to $0.46 per pound f.o.b. in March 2020.

176. On September 21, 2020, United conveyed to Mr. Wistisen that it was "**firm** at $36.50 (no change). . ." (Emphasis added). Spot beet sugar prices from late September 2020 to December 2020 remained firm at $0.36.

177. On February 17, 2021, Mr. Wistisen conveyed the following to Mr. Henderson at ASR/Domino: "Long conversation with United: won't set FY 22 price list until March, but the plan remains to **hold steady** at $36.50 and $38.50. . . ." (Emphasis added). Indeed, following the ISC meeting on March 3, 2021, most producers continued to offer beet sugar for $0.36 f.o.b. and $0.38.

178. In addition to holding prices firm in parallel, Defendants increased their prices in parallel. By May 2021, United's stance had changed from holding firm on prices, and Mr. Wistisen informed ASR/Domino as much: "expect big action over the next month, . . . and at that time expect to raise prices, and not by just a dollar . . ."

48

179.    For the 2021-22 contract season, Michigan Sugar started its offers at $0.38 per pound f.o.b. increasing to $0.39 in June 2021. Also in June 2021, ASR/Domino offered its refined cane sugar for $0.42 per pound f.o.b. from its Northeast and West Coast refineries.

180.    In early August 2021, ASR/Domino increased the price for cane sugar in the 2021-22 contract period to $0.44 per pound f.o.b. from its Northeast and West Coast refineries. By late August, ASR/Domino increased its prices to $0.45 per pound f.o.b. from its Northeast and West Coast refineries while Michigan Sugar offered beet sugar at $0.41 per pound f.o.b. for the 2021-22 contracts.

181.    In October 2021, ASR/Domino raised its price for the rest of 2021 to $0.55 per pound f.o.b. from all its refineries and $0.48 per pound from its Northeast and West Coast refineries and $0.46 cents from its Gulf and Southeast refineries beginning in January 2022.

182.    Following the ISC meeting in early March 2022, the average price of refined beet sugar spiked from $0.42 per pound f.o.b. in the Midwest in March 2022 to $0.70 in July 2022—almost a 40% increase. The average price of spot refined cane sugar in the Northeast increased from $0.52 per pound f.o.b. in March 2022 to $0.54 in April 2022 and continuously increased to $0.68 in July 2022. In July 2022, ASR/Domino offered refined cane sugar at $0.56 per pound f.o.b. in its Northeast and West Coast refineries for its 2023 contracts—up over 34% from nearly a year prior.

183.    Following the ISC meeting in early March 2023, the average price of refined beet sugar increased from $0.60 per pound f.o.b. in the Midwest to $0.62 in May 2023. The average price of refined cane sugar jumped from $0.62 per pound f.o.b. in the Northeast in March 2023 to $0.68 in May 2023.

49

184.   Despite adequate sugar supplies, parallel price increases continued throughout the year for both cane and beet sugar. In April 2023, ASR/Domino increased the price of sugar to $0.60 per pound f.o.b. Northeast and West Coast for the 2023-24 contracting year. Refined beet sugar prices were firm in the Midwest between the $0.57 to $0.62 per pound f.o.b. range. In May 2023, ASR/Domino increased its prices for 2024 contracts to $0.61 a pound f.o.b. Northeast and West Coast, and $0.59 per pound f.o.b. for Southeast and the Gulf.

185.   In October 2023, ASR/Domino offered its refined cane sugar for 2024 at $0.63 per pound f.o.b. from its Northeast and West Coast refineries. With the start of the contracting season for 2024-25 beginning in earnest in February 2024, buyers saw offers of $0.53 to $0.55 per pound f.o.b. in the Midwest while ASR/Domino offered bulk refined cane sugar at $0.60 per pound f.o.b. from its Northeast and West Coast refineries.

186.   Although sugar production in the United States set a new record in 2024, prices remained high throughout the year. There were reports at the end of the year that despite ample supplies, beet processors had no desire to lower prices to contract that sugar.

187.   The DOJ Proposed Findings of Fact in the Merger Litigation concluded that, just like United, "Imperial and Domino similarly anticipate competitive reactions, use pricing to send signals to competitors, and consider how their actions may cause market prices to decline." The DOJ Statement of Facts cited to Imperial's Senior Vice President of Sales, Patrick Henneberry, expressing concern that lowering pricing "would be snatching something from United just as they are starting to show some upside price movement;" and ASR/Domino's Mr. Henderson explaining a decision not to get "aggressive" on pricing because Domino "would like to avoid sending a signal out to competitors that we are chasing business and lowering pricing." ASR/Domino's Robert

Sproull instructed Mr. Henderson to "signal to the market" that there would be tightness and ASR/Domino would maintain price.

188.    As further evidence of parallel conduct, ASR/Domino bluntly stated that after the Imperial/United merger "[i]t's going to be more important than ever to stay close to United" and "[t]his is setting up to smell a bit like ADM/Cargill in the corn sweetener industry. 2 players that account for ~65% of the industry . . ." Further, "[a]fter speaking with his 'trusted friend,' the Imperial's CEO, ASR/Domino's Mark Olson wrote that following the transaction, United/U.S. Sugar would be more likely to follow Imperial's 'cane price approach,' which likely is a good thing for [ASR/Domino]."

189.    The parallel pricing resulted in dramatic overall increases to the market for Refined Sugar. Pricing of Refined Sugar reached a low point in late 2013 and early 2014. Prices then started trending upward for the most part, but at modest levels of progression. United employed Wistisen/Commodity at least as early as 2019 to enable it to fix or coordinate prices with its competitors. Commencing on or about October 2019, prices experienced one of the steepest climbs ever, and by 2024, Refined Sugar prices were at their highest levels since the mid-1970s, when DOJ indicted major sugar refiners for a price-fixing scheme.

E.    **Additional Plus Factors Support the Existence of a Conspiracy**

190.    When producers engage in parallel pricing, courts examine whether a plaintiff has alleged sufficient facts to make it plausible that the parallel-pricing behavior is the result of collusion rather than competition. In this case, there is direct evidence that the Defendants communicated through Mr. Wistisen and others to maintain an agreement to elevate Refined Sugar prices to supracompetitive levels. There is also evidence that the Defendants agreed on a common

51

formula to fix prices. These facts, standing alone, are sufficient to raise the inference of conspiracy from "possible" to "plausible."

191.   In addition to the direct evidence described above, there are other economic factors, also known as "plus factors" in antitrust parlance, that support an inference of collusion. Plus factors are economic actions and outcomes, above and beyond parallel conduct by oligopolistic firms, that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action, that support an inference of a conspiracy. The exchange of CSI among competitors, as described above, is a plus factor that strongly supports an inference of collusion.

192.   Here, in addition to the sharing of CSI, plus factors that further support an inference of collusion include: (a) conduct that, absent collusion, would have been contrary to Producer Defendants' self-interest; (b) sugar industry consolidation and concentration, (c) high barriers to entry, (d) inelastic demand, (e) vertical integration, (f) opportunities to collude, (g) the fungible, commodity nature of Refined Sugar, and (h) a history of antitrust violations by sugar manufacturers, including a number of the Producer Defendants and/or their predecessors.

### 1. The Defendants Engaged in Conduct That, Absent Collusion, Would Have Been Contrary to Their Self-Interest.

193.   The Producer Defendants understood that the CSI they provided to Commodity would not ordinarily be disclosed to competitors, and sharing such CSI would be detrimental to their business interests were it not for the existence of their conspiracy.

194.   In a competitive market, a rational producer would closely guard its current prices, forward pricing strategies, and sold positions—all of which constitute highly confidential and competitively sensitive information that competitors would not share with each other in the absence of an agreement to do so. Disclosing such information unilaterally to rivals would enable

those rivals to undercut the disclosing producer's prices and win business away from it, which would be against a producer's self-interest.

195.    Further, in a competitive market, a firm with available supply and excess capacity has a strong unilateral incentive to lower its price slightly below a rival's to capture incremental customers and grow market share. The decision to deliberately forgo this opportunity—specifically to avoid alarming competitors—is contrary to self-interested competitive behavior. For example, ASR/Domino's Mr. Henderson explained a decision not to get "aggressive" on pricing because Domino "would like to avoid sending a signal out to competitors that we are chasing business and lowering pricing." Such conduct is only rational if a producer has agreed with its competitors to abstain from price competition.

196.    Similarly, Imperial's Senior Vice President of Sales, Patrick Henneberry, expressed concern that lowering pricing "would be snatching something from United just as they are starting to show some upside price movement." A rational competitor would want to "snatch" business from a rival when conditions are favorable. Choosing not to do so to protect a rival's pricing momentum is clearly contrary to self-interested conduct.

### 2. The Market is Highly Concentrated, and the Defendants Are the Dominant Firms.

197.    Producer Defendants account for more than 70% of the market for Refined Sugar.[15]

198.    While the Producer Defendants dominate the industry, none of the remaining producers of Refined Sugar had a market share that remotely approaches that of the Producer Defendants.

---

[15] *See supra* Figure 2, para. 104.

199.    Consolidation of these vertically integrated companies made the market even more concentrated during the Relevant Period. One example of this is U.S. Sugar Savannah's acquisition of Imperial in November 2023, resulting in a substantial increase in dominance by ASR/Domino and United.

### 3.    Barriers to Entry Are High.

200.    There are high barriers to becoming a manufacturer of Refined Sugar. The start-up capital necessary to compete with today's Refined Sugar manufacturers would be, at least, in the hundreds of millions of dollars. Refined Sugar manufacturers have large economies of scale, utilizing large and expensive production facilities. Furthermore, Refined Sugar manufacturers must be vertically integrated with growers of sugar beets or sugar cane to qualify for USDA loans and production allotments that enable growers to process raw sugar into Refined Sugar without competition from imports. USDA production allotments linked to USDA loan programs and limitations on imports and tariffs, limit foreign competitors entering the U.S. market that could otherwise serve as a competitive restraint on Producer Defendants.

### 4.    Demand for Sugar is Inelastic.

201.    Economic theory recognizes that industries with inelastic demand are more susceptible to cartel behavior because of the potential for large increases in revenue resulting from the higher cartel prices.

202.    Demand for Refined Sugar is inelastic, so a decrease in supply in the face of stable or rising demand will increase prices. Defendants recognize that Refined Sugar demand is inelastic—that is, the Producer Defendants knew that they could demand higher prices when less Refined Sugar was available to sell. As a result, they routinely exchanged information about their

54

sold position to maintain higher prices because they knew that there were no meaningful substitutes for Refined Sugar.

### 5. Defendants Are Vertically Integrated.

203. The Refined Sugar industry is almost entirely vertically integrated. In the Refined Sugar industry, "vertical integration" means the Refined Sugar producer owns or controls each aspect of growing sugar cane or sugar beets, processing these crops into raw sugar using their own processing facilities, refining the raw sugar into Refined Sugar in their own refining facilities, and selling their Refined Sugar to direct purchasers such as Plaintiffs. A consolidated market with vertically integrated participants is a structural characteristic that makes an industry conducive to collusion.

### 6. Defendants Had Numerous Opportunities to Collude.

204. In addition to sharing CSI through Mr. Wistisen and disseminating non-public statements to competitors, Defendants had opportunities to collude through annual ISC meetings, which is run by the International Dairy Foods Association ("IDFA"), and is held in between the end of February and the beginning of March of each year. For example, at the 2019 session, there were extensive presentations of the factors that would dictate future sugar prices during the upcoming year, including "factors [that] will dictate domestic sugar prices going forward."

205. The IDFA has characterized the purpose of the ISC as follows: "[t]he Colloquium draws hundreds of professionals and decision-makers from the sweetener industry and from companies that use sweeteners in the products they make. Buyers, processors, refiners, distributors, and food companies actively participate in the Colloquium, using it as a springboard to enhance their business and trading-partner network."

206.    Due to the COVID-19 pandemic, the annual ISC meeting was held virtually in 2021, but resumed in person in 2022 and the years that have followed. Defendants frequently sponsored the ISC meetings and had employees attend the meetings. For example, at the 2019 ISC meeting, Imperial's Senior Vice President of Sales, Patrick Henneberry, was a panelist on "Sugar Program Administration." At the 2020 ISC meeting, ASR/Domino's Director of National Accounts, Adam Whittaker and Vice President of Industrial Sales, Adam Henderson, were listed as attendees of the meeting, along with several other ASR/Domino employees. United's President & CEO Matthew Wineinger, Executive Vice President Dirk Swart, Director of Strategic Accounts, Eric Speece, and other United employees were also listed as attendees of the meeting. Michigan Sugar's Account Manager Chaise Wilson, Imperial's President Michael Gorrell, and other Louis Dreyfus employees were listed as attendees of the meeting. In 2023, ASR/Domino's Whittaker and Henderson were, again, listed as attendees along with other ASR/Domino's employees. United's President & CEO Matthew Wineinger, Executive Vice President Dirk Swart, Director of Strategic Accounts, Eric Speece, and other United employees were also listed as attendees of the 2023 ISC meeting. Michigan Sugar's Vice President of Sales and Marketing John Whaley and other account managers were listed as attendees of the meeting. Additionally, Mike Gorrell, Imperial's former president, attended the meeting as a representative of U.S. Sugar Savannah Refinery along with other employees. Discussions on the sidelines of the ISC are a prime opportunity for collusion. In recent times, the event has served to kick start sales for the following year. For example, in 2022, future contract prices for Number 16 sugar were discussed at the ISC and then finalized in the weeks following the event. These prices in turn were used to estimate Number 16 sugar futures, which in turn could be used to develop actual Number 16 spot prices during 2022 and 2023.

56

207.    The ISC did not just present the *opportunity* for collusion; the Producer Defendants took full advantage of that opportunity. As discussed above, Refined Sugar prices rose after ISC meetings several times during the Relevant Period. *See supra*, para. 169.

208.    In addition to participating in the ISC, the Producer Defendants are each members, either directly or through one of their affiliated companies, of various trade associations such as The Sugar Association. The Producer Defendants, directly or through their affiliates, hold or held board positions on these trade associations during the Relevant Period. For example, at various times during the Relevant Period, the Board of The Sugar Association has included Pepe Fanjul (ASR/Domino), Mike Greear (Wyoming Sugar Company, one of the member-owners of United), Matt Hoffman (Sugar Cane Growers Cooperative of Florida, parent company of ASR), Neil Juhnke (Michigan Sugar), Peter O'Malley (ASR/Domino), Parks Shackelford (Florida Crystals, parent company of ASR), Rob Sproull (ASR/Domino), and Kurt Wickstrom (Minn-Oak, one of the member-owners of United), and Mike Gorrell (former President of Imperial). These memberships afford them opportunities to collude during the Relevant Period.

209.    Further, the crossover of employees among the Defendants provided additional opportunities to collude or exchange CSI. For example, ASR/Domino's director of national accounts, Adam Whittaker, ASR/Domino's national accounts manager, Brian Dahlman, and United's director of strategic accounts, Eric Speece, were each former employees of Cargill. Mr. Whittaker worked at Cargill for more than a decade before joining ASR/Domino, while Mr. Speece worked at Cargill for about nine years prior to joining United. Both Mr. Whittaker's and Mr. Speece's employment at Cargill overlapped for a five-year period. Mr. Whittaker, Mr. Speece, and Mr. Dahlman were each involved in the exchange of CSI as described in the email exchanges detailed herein.

### 7.  Refined Sugar is a Commodity.

210.  Refined Sugar is a fungible commodity. Though it comes in different forms, it is based on raw sugar and the Granulated Sugar that makes up its primary ingredient. Coordination is easier with a commodity product because firms wishing to form a cartel can more easily monitor and detect defections from a price-fixing agreement where observed differences in prices, other than those arising because of differences in product grade, for example, are more likely to reflect cheating on the conspiracy than some kind of custom arrangement.

211.  Futures contracts for domestic raw cane sugar and "White Sugar" (symbol "W") are traded on the Intercontinental Exchange ("ICE") alongside other commodity products such as wheat, crude oil, and gold. Typically, when a product is characterized as a commodity, competition is based principally on price as opposed to other attributes such as product quality or customer service. The commodity nature of Refined Sugar helps to facilitate cartel behavior.

212.  Due to the lack of product differentiation, the Producer Defendants are forced to compete on price such that the pricing decisions of each Refined Sugar producer affect the market price for Refined Sugar.

213.  In sum, the Refined Sugar industry has characteristics that ensure the exchanges by Defendants of CSI are highly anticompetitive. The exchanges allowed the Producer Defendants to raise, fix, maintain, or stabilize Refined Sugar prices during the Relevant Period. As a result, Defendants' unlawful conduct caused Plaintiffs to pay artificial prices for Refined Sugar during the Relevant Period. These prices exceeded the amounts they would have paid if the prices for Refined Sugar had been determined in a competitive market. Plaintiffs suffered antitrust injury because of Defendants' conduct.

58

**8.    There is a History of Anticompetitive Conduct in the Sugar Industry.**

214.    The sugar industry in the United States has long been plagued by anticompetitive practices, with violations of antitrust laws dating back nearly a century. This historical pattern of misconduct serves as a backdrop to the present conspiracy, highlighting the industry's susceptibility to collusion and the Defendants' deliberate perpetuation of these unlawful practices.

215.    In the 1930s, the United States Supreme Court addressed the antitrust violations of the Sugar Institute, a trade association for sugar manufacturers.[16] The Court upheld findings that the Sugar Institute engaged in collusion by mandating advance price announcements and strict adherence to those announced prices and terms. These practices stifled competition and allowed manufacturers to control the market, setting a precedent for subsequent antitrust enforcement in the sugar industry.

216.    The anticompetitive tendencies of the sugar industry resurfaced in 1948 when the Supreme Court examined the activities of American Crystal Sugar, now part of Defendant United.[17] That case centered on agreements among California sugar refiners to pay uniform prices for sugar beets. The Supreme Court condemned this arrangement, noting its far-reaching monopolistic effects. By eliminating price competition among refiners, the agreements deprived sugar beet growers of any competitive opportunity, increased market control over sugar sales, and entrenched a monopolistic structure. The Supreme Court's decision underscored the inherent dangers of collusion in the sugar industry and its devastating effect on competition.

217.    In the 1970s, DOJ uncovered another collusive scheme involving sugar refiners, including California & Hawaiian Sugar Company (later acquired by Defendant ASR/Domino) and

---

[16] *Sugar Inst., Inc. v. United States*, 297 U.S. 553 (1936).

[17] *Mandeville Island Farms v. Am. Crystal Sugar*, 334 U.S. 219 (1948).

American Crystal Sugar Corporation (part of Defendant United). The sugar refiners were accused of using "brokers to act as go-betweens in carrying price information and exchanging assurances on price actions between and among refiners" to facilitate price-fixing.

218.    This led to a 1978 consent decree prohibiting such conduct, including direct communications about future prices and the use of intermediaries to facilitate price discussions. Despite these prohibitions, the practices described in the decree bear striking similarities to the conduct alleged in this case.

219.    The DOJ's actions in the 1970s sparked multiple private class action lawsuits on both coasts of the United States, where courts certified classes of affected consumers. *See, e.g.*, *In re Sugar Indus. Antitrust Litig.*, MDL No. 201 (N.D. Cal.). These cases ultimately settled, further illustrating the pervasiveness of anticompetitive practices in the sugar industry and the widespread harm inflicted on consumers.

220.    The history of antitrust violations in the sugar industry reveals a consistent pattern: sugar producers and refiners have repeatedly used information exchanges and pricing agreements to suppress competition. The Defendants' conduct in the present case is a continuation of this troubling legacy, exploiting structural vulnerabilities in the industry to agree upon and maintain artificially high prices for Refined Sugar.

### F.    Defendants' Information Exchange is an Independent Violation of Section 1 of the Sherman Act.

221.    Competition is harmed when, as here, competitors with market power in a concentrated market exchange confidential, strategic information about current and forward-looking plans for prices and supply. Price, capacity, supply, and costs are crucial aspects of competition. Information exchanges advance competitors' ability to collude.

222.    It is long-held Supreme Court precedent that exchanges of CSI among competitors may independently violate Section 1, even without an express agreement to fix prices. "Exchanges of current price information . . . have the greatest potential for generating anticompetitive effects and . . . have consistently been held to violate the Sherman Act." *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978); *see also Todd v. Exxon*, 275 F.3d 191, 211 (2d Cir. 2001) (same). "By the same reasoning, exchanges of future price information are considered especially anticompetitive." *Todd*, 275 F.3d at 211. "Genuine competitors do not make daily, weekly, and monthly reports of the minutest details of their business to their rivals . . ." *Am. Column & Lumber Co. v. United States*, 257 U.S. 377, 410 (1921); *see also United States v. Container Corp. of Am.*, 393 U.S. 333, 336-38 (1969) (information exchange of price data among competitors unlawful despite absence of agreement to adhere to a price schedule where the exchange had an anticompetitive effect in the industry).

223.    The Second Circuit has explained, "'[a] number of factors including most prominently the structure of the industry involved and the nature of the information exchanged are generally considered in divining the procompetitive or anticompetitive effects of this type of interseller communication.'" *Todd*, 275 F.3d at 199 (quoting *Gypsum*, 438 U.S. at 441 n.16). "[E]xchanges of current price information have the greatest potential of creating anticompetitive effects and have consistently been held to violate the Sherman Act."[18]

224.    The DOJ and the FTC have stated that information exchanges with direct competitors raise serious antitrust concerns:

> [T]he sharing of information related to a market . . . in which the participants are actual or potential competitors may increase the likelihood of collusion on matters such as price, output, or other

_____

[18] *In re SSA Bonds Antitrust Litig.*, No. 16 Civ. 3711 (ER), 2020 WL 1445783, at *4 (S.D.N.Y. Mar. 25, 2020) (citing *Gypsum*, 438 U.S. at 441 n.16).

61

competitively sensitive variables. The competitive concern depends on the nature of the information shared. Other things being equal, the sharing of information relating to price, output, costs, or strategic planning is more likely to raise competitive concern than the sharing of information relating to less competitively sensitive variables.[19]

225.    The DOJ has recently demonstrated a renewed focus on anticompetitive information sharing. On February 3, 2023, the DOJ withdrew antitrust policy statements that provided safe harbors for sharing pricing or cost information, concluding that the policy statements were "overly permissive on certain subjects, such as information sharing, and no longer serve[d] their intended purposes of providing encompassing guidance to the public on relevant healthcare competition issues in today's environment." In December 2023, FTC and DOJ jointly withdrew the Antitrust Guidelines for Collaboration Among Competitors, and explained that "[t]he Agencies are committed to vigorous antitrust enforcement on a case-by-case basis in the area of competitor collaborations because such collaborations can harm competition and subvert the competitive process."[20] In an amicus brief filed on October 1, 2024 in *Pork* (Dkt. No. 2616), DOJ explained that information sharing by itself can violate the antitrust laws:

> As relevant here, competitors' exchange of competitively sensitive information is itself a form of concerted action that can violate the antitrust laws. As the Supreme Court explained in *United States v. Container Corp.*, reciprocal information exchange among competitors is "concerted action [that] is of course sufficient to establish the combination or conspiracy, the initial ingredient of a violation of § 1 of the Sherman Act." 393 U.S. 333, 335 (1969) (emphasis added). This is so even when the participants have the "freedom to withdraw from the agreement" and when the exchanges are "infrequen[t] and irregular[]." *Id.*; see, e.g., *Todd*, 275 F.3d at

[19] F.T.C. and U.S. Dep't of Just., *Antitrust Guidelines for Collaborations Among Competitors*, 15 (Apr. 2000), https://www.ftc.gov/sites/default/files/documents/public_events/joint-venture-hearings-antitrust-guidelines-collaboration-among-competitors/ftcdojguidelines-2.pdf.

[20] *Justice Department and Federal Trade Commission Withdraw Guidelines for Collaboration Among Competitors*, https://www.justice.gov/atr/media/1380001/dl?inline.

198 (recognizing that an "information exchange itself" can form a claim under Section 1).

Dkt. No. 2616 at 5.

226.    With respect to a stand-alone information exchange claim, DOJ went on to say: "Standalone information-sharing claims are evaluated under the rule of reason . . . If information sharing tends to harm competition based on the full factual circumstances, 'liability follow[s].'" *Id.* at 7-8 (quoting *Gypsum*, 438 U.S. 422, 446-47 n.22).

227.    The DOJ reiterated that information sharing can also support the inference of a price-fixing conspiracy, as Plaintiffs have alleged here, explaining:

> Information exchanges can be relevant to concerted action in a second way: An information exchange among competitors can support an inference that a price-fixing or output-restriction agreement exists. Plaintiffs therefore regularly rely on information exchanges as evidence of a conspiracy to fix prices or restrict output. *See Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan*, 203 F.3d 1028, 1033 (8th Cir. 2000) (en banc) (recognizing that information exchanges can serve as a 'plus factor' suggestive of a price-fixing conspiracy); *Penne v. Greater Minneapolis Area Bd. of Realtors*, 604 F.2d 1143, 1151 (8th Cir. 1979).

*Id*. at 5-6. In such circumstances, the per se rule of antitrust liability applies.

228.    Indeed, the "[e]xchange of disaggregated data can harm competition even if the individual firms are not explicitly identified, and the United States has obtained consent decrees in recent years with firms that shared disaggregated information without directly identifying individual competitors." *Id*. at 15 n.11.

229.    Recently, DOJ filed a Statement of Interest in the parallel class actions against the same Defendants involving substantially similar allegations as those here. *Granulated Sugar,* Dkt. No. 415. There, DOJ explained that class plaintiffs' "information-sharing claim pleads concerted action," because:

63

Wistisen requested information about pricing and output from sugar producers/sellers and provided them with similar information about their competitors . . . The alleged information exchangers thus mutually understood that, once they provided their information, Wistisen 'would in turn share it' with their rivals…that is, they "kn[e]w[] that concerted action was contemplated and invited," *Interstate Circuit v. United States*, 306 U.S. 208, 226 (1939). By nonetheless submitting the requested data and accepting corresponding data about competitors…the producers/sellers allegedly 'gave their adherence to' the information- sharing 'scheme and participated in it,' *Interstate Circuit*, 306 U.S. at 226. That is 'enough,' *id.*, to plead concerted action. Put differently, when a party 'furnishe[s]' requested data to competitors 'with the expectation that it would be furnished reciprocal information when it wanted it,' that 'is of course sufficient to establish [a] combination or conspiracy' under Section 1. *Container Corp.*, 393 U.S. at 335.

Dkt. No. 415 at 12–13.

230. Here, Defendants' information exchange existed for the purpose of increasing prices of Refined Sugar above competitive levels and aiding the Producer Defendants in abusing their market power to suppress price competition.

231. Defendants' information exchange took place in secret and involved the exchange of confidential, current, and forward-looking information.

232. Further, as alleged above, Defendants' information exchange occurred in a market with characteristics that make it particularly likely that such an exchange will have anticompetitive effects, including a market with inelastic demand, relatively few sellers, and a fungible product, for which competition is price-based.

233. As a result, as alleged above, prices for Refined Sugar rose significantly during the Relevant Period.

234. There is no legitimate procompetitive justification for Defendants' conduct.

64

235. Defendants, through their use of Commodity and Mr. Wistisen to exchange nonpublic current and forward price and sales information, have caused direct anticompetitive effects across the nation in the form of higher prices to direct purchasers, such as Plaintiffs.

**G.    The USDA Sugar Program Does Not Render the Conspiracy Any Less Plausible.**

236. The current USDA sugar program structure originates from the Agriculture and Food Act of 1981 (1981 Farm Bill) and has been reauthorized since with some modifications.

237. The Sugar Program was most recently reauthorized by Congress in 2018 with minor changes from the preceding 2014 and 2008 bills. "The only change to the sugar program under the 2018 farm bill was a 5% increase in the [loan] rate for raw cane and refined beet sugar." The 2014 Farm Bill left the objective and structure of the sugar program unchanged from the 2008 Farm Bill and maintained the FY2012 loan rate which was enacted in the previous bill. The 2018 bill has received three one-year extensions, with the most recent set to expire on September 30, 2026.

238. The objective of the Sugar Program is "to support domestic sugar prices without incurring budgetary costs to the federal government while also ensuring that adequate supplies of beet and cane sugar are available to sugar users."

239. In the USDA's discussion of the Sugar Program, the term "producers" refers to those who produce sugarcane or sugar beet crops. Sugar processors are those who are involved in the processing and refining steps of the supply chain. That is, sugar processors use sugarcane, sugar beets, and raw sugar as inputs to produce Refined Sugar. Among processors, USDA differentiates between beet processors, cane processors, and cane refiners.

240. The sugar program is administered by the USDA and has four main mechanisms to keep sugar prices above guaranteed levels: price support loans, marketing allotments, import quotas, and a sugar-to-ethanol backstop (also known as the Feedstock Flexibility Program).

65

241.　**Price Support Loans**. The USDA offers price support loans to processors of domestically grown sugarcane and sugar beets. The loans are specifically offered to processors and not producers of the crops since sugarcane and sugar beets are bulky and perishable, so they must be processed before they can be traded and stored.

242.　"The price levels at which processors can take out loans are referred to as 'loan rates.'" The current national average loan rates since October 1, 2025 are set as 24.00 cents per pound for raw sugar and 32.77 cents per pound for refined beet sugar. That is, the national average loan rates are fixed even though sugar supply and prices would change year over year. The national average loan rates "are adjusted regionally to reflect marketing cost differentials."

243.　The maximum term of the loan is nine months. The loans are nonrecourse, meaning that when the loan is due, the processor can either repay the loan with interest or forfeit the sugar to USDA, "if the market price is below the effective support level."

244.　There have been no loan forfeitures of sugar during the Relevant Period. The Farm Service Agency ("FSA") produces quarterly reports projecting whether the U.S. sugar stocks reported in the World Agricultural Supply and Demand Estimates report are likely to lead to forfeitures. The FSA's projections have concluded that forfeitures are unlikely for every quarter since March 2019. This is supported by the FSA's national level database of loan forfeitures for all commodities, which lists no forfeitures for beet sugar, cane sugar, or in-process sugars since at least 2019.

245.　The lack of sugar loan forfeitures since 2019 suggests that market prices are above the effective support level since 2019. Therefore, the price support loans do not constitute a binding constraint for United States sugar prices during the Relevant Period.

246.    **Marketing Allotments**. USDA establishes annual marketing allotments "that limit the quantity of sugar that U.S. processors can sell for domestic human use." There is an overall allotment quantity ("OAQ") that is "not less than 85% of estimated U.S. human consumption of sugar." The allotment is divided between beet and cane sugar and is allocated to processors based on their sales and capacity.

247.    This allotment explicitly does not limit "how much beet and cane farmers can produce" nor "how much sugar beets and sugarcane that beet refiners and raw sugar mills can process." "The OAQ is intended to ensure that permitted sales of domestic sugar, when added to imports under U.S. trade commitments, do not depress market prices below loan forfeiture levels for refined beet sugar and raw cane sugar. Sugar production that is in excess of a processors' marketing allotment may not be sold for human consumption except to allow another processor to meet its allocation or for export."

248.    **Import Quotas on Raw Sugar**. "The United States negotiated sugar [tariff-rate quotas ("TRQs")] as part of the Uruguay Round Agreement on Agriculture (AoA). These are also called World Trade Organization (WTO) TRQs." Each fiscal year, the Secretary of Agriculture sets a TRQ that limits how much sugar can be imported duty free or at a low duty.

249.    Different import quotas apply to raw sugar and to Refined Sugar. Producer Defendants import raw sugar while Refined Sugar are primarily imported into the U.S. by distributors.

250.    Import quotas on raw sugar set a minimum, as opposed to a maximum, of raw sugar that can be imported into the United States, according to the World Trade Organization Agreement on Agriculture ("AoA").

251.    Empirical evidence shows that the TRQ for raw sugar was set at levels close to the minimum for most of the Relevant Period. According to the AoA, the raw sugar TRQ was at the minimum level in 2019, and close to it in 2021 through 2023.

252.    The USDA Sugar Program does not set prices for sugar nor does it prevent the conspiracy from charging anticompetitive prices during the Relevant Period.

**H.    Defendants' Anticompetitive Conduct Proximately Caused Plaintiffs to Suffer Antitrust Injury and Damages.**

253.    Because of the Defendants' anticompetitive conduct: (1) competition in the Refined Sugar market has been reduced or eliminated, (2) prices for Refined Sugar have been maintained at supra-competitive levels, and (3) United States purchasers of Refined Sugar have been deprived of the benefit of price competition.

254.    As a result of the Defendants' anticompetitive conduct, Plaintiffs paid more for Refined Sugar than they otherwise would have paid and thus suffered antitrust injury and damages. The overcharges paid by Plaintiffs for Refined Sugar constitute antitrust injury and harm to competition under the federal antitrust laws.

**V.    TOLLING AND FRAUDULENT CONCEALMENT**

255.    Defendants actively, effectively, affirmatively, and fraudulently concealed their unlawful conspiracy from Plaintiffs, and the conspiracy itself was self-concealing. Defendants promised to obey the law and act with integrity in their codes of conduct, ethics, and corporate social responsibility. These promises to obey the law and behave with integrity prevented Plaintiffs from discovering Defendants' conduct earlier.

256.    Plaintiffs were not placed on actual or constructive notice of the conspiracy alleged herein until November 1, 2022 when the appellate exhibit volumes from the Merger Litigation were made public. Prior to that time, there was insufficient information to suggest that the

68

Defendants were involved in a conspiracy to fix prices, rig bids, or allocate the Refined Sugar market.

257.    Defendants' fraudulent concealment of their unlawful conspiracy has tolled any applicable statutes of limitations by equitable estoppel for Plaintiffs with respect to any claims and rights of action that Plaintiffs have alleged in this Complaint.

258.    Moreover, under the *American Pipe* tolling doctrine, it is well established that the filing of a class action tolls the statute of limitations for all members of the putative class. *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 554 (1974). Prior to filing this action, each Plaintiff was an absent member of the putative direct purchaser class. Accordingly, each Plaintiff is entitled to the benefit of class tolling.

259.    On March 14, 2024, the first class action complaint alleging a conspiracy to fix prices of Granulated Sugar was filed by a putative class of direct purchaser plaintiffs.[21] On June 7, 2024, that action was consolidated and centralized with other similar putative class actions filed by direct purchaser plaintiffs before the Honorable Jerry W. Blackwell in the District of Minnesota. *Granulated Sugar,* No. 24-md-03110, Dkt. No. 1. The filing of the first putative direct purchaser complaint on March 14, 2024 tolled the statute of limitations as to Plaintiffs' Sherman Act claims alleged herein.

260.    Plaintiffs allege herein that their claims for all products comprising Refined Sugar as defined herein were tolled as of March 14, 2024. In the alternative, Plaintiffs' claims for Granulated Sugar were tolled as of March 14, 2024, and Plaintiffs' claims concerning Refined Sugar products in addition to Granulated Sugar — including liquid, powdered, and brown sugar —were tolled for a discrete period running from December 9, 2024, when the putative direct

---

[21] *KPH Healthcare Servs., Inc., v. ASR Group Int'l, Inc. et al.*, No. 1:24-cv-01941 (S.D.N.Y.).

purchaser plaintiffs filed a Consolidated Class Action Complaint alleging a price-fixing conspiracy encompassing Refined Sugar (*id.*, Dkt. No. 294), through February 27, 2025, when the putative direct purchaser class filed a superseding Master Consolidated Complaint limiting their claims to Granulated Sugar alone. *Id.*, Dkt. No. 332.

261. Plaintiffs' claims are also timely under the continuing violations doctrine. Each sale by the Defendants at prices affected by the conspiracy constitutes a new overt act causing injury to Plaintiffs.

## VI.    CLAIMS FOR RELIEF

### COUNT I
### Violation of Sections 1 and 3 of the Sherman Act
### and Sections 4 and 16 of the Clayton Act—Unlawful Price-Fixing
### (15 U.S.C. §§ 1, 3, 15(a), 26)

262. Plaintiffs incorporate and allege each and every allegation set forth in the preceding paragraphs of this Complaint, as though fully set forth herein.

263. Beginning at a time currently unknown to Plaintiffs, but at least as early as January 1, 2019, and continuing through the present, Defendants and their co-conspirators entered into an unlawful and continuing contract, combination, or conspiracy in unreasonable restraint of trade to artificially raise, fix, maintain, or stabilize prices for Refined Sugar in the United States to or at supracompetitive levels, in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

264. Beginning at a time currently unknown to Plaintiffs, but at least as early as January 1, 2019, and continuing through the present, the Defendants effectuated the foregoing conspiracy through the means described herein, including through the exchange of competitively sensitive, non-public information regarding prices, output, supplies, and costs to raise, fix, maintain, or stabilize prices for Refined Sugar in the United States.

265.    Defendants' conduct had the intended, likely, and actual effect of raising, fixing, maintaining, or stabilizing prices in the Refined Sugar market in the United States to or at supracompetitive levels, in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

266.    This conduct is unlawful per se as a violation of the antitrust laws.

267.    The contract, combination, or conspiracy alleged herein has had the following effects, among others:

a)  Price competition in the sale of Refined Sugar has been restrained, suppressed, and/or eliminated in the United States;

b)  Prices for Refined Sugar sold by the Producer Defendants have been raised, fixed, maintained, or stabilized to or at artificially high, noncompetitive levels throughout the United States; and

c)  Those who purchased Refined Sugar directly from the Producer Defendants or their co-conspirators have been deprived of the benefits of free and open competition.

268.    Plaintiffs have been injured in their business and properties by paying more for Refined Sugar purchased directly from the Producer Defendants or their co-conspirators than Plaintiffs would have paid in the absence of the contract, combination, or conspiracy. Plaintiffs will continue to be injured in their business and properties by reason of Defendants' continuing violations of Section 1 and 3 of the Sherman Act, within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

269.    Plaintiffs are entitled to treble damages and injunctive relief against Defendants, preventing and restraining the violations alleged herein.

//

71

## COUNT II
### Violation of Sections 1 and 3 of the Serman Act
### and Sections 4 and 16 of the Clayton Act – Unlawful Information Exchanges
### (15 U.S.C. §§ 1, 3, 15(a), 26)

270. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

271. For purposes of this Count, which is based upon a claim subject to a Rule of Reason analysis or some abbreviated version therein, the relevant geographic market is the United States and its territories, and the relevant product market consists of Refined Sugar made from either sugar beets or sugar cane, which the industry treats as indistinguishable from each other. As noted above, during the Relevant Period, the Producer Defendants had at least a collective 72% share of this market and thus possessed, and continue to possess, market power within it. In the Merger Litigation, the Court determined, and Defendant United agreed, that the relevant product market was Refined Sugar, in all of its forms. *See supra*, para. 84.

272. In the alternative, the relevant product market consists of "Granulated Sugar," defined as sugar made by extracting juice from sugar cane or sugar beet, processing the juice to remove impurities and to concentrate it into a thick syrup, boiling it until sugar crystals form, separating the sugar crystals from the syrup in a centrifuge, drying the sugar crystals with hot air, and grinding them to uniform size.

273. Beginning at a time currently unknown to Plaintiffs, but at least as early as January 1, 2019, and continuing through the present, Defendants agreed with each other to exchange competitively sensitive, non-public information regarding prices, output, supplies, and costs to raise, fix, maintain, or stabilize prices for Refined Sugar in the United States to or at supracompetitive levels. The agreement was intended to and did unreasonably restrain trade and suppress competition, and it had the likely and actual effect of raising, fixing, maintaining, or

stabilizing prices in the Refined Sugar market in the United States to or at supracompetitive levels, in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

274.    Pursuant to the agreement, Defendants agreed to and did share pricing and other internal, material competitive information that distorted and suppressed competition in the relevant market while knowing and intending that the information would be used to raise, fix, maintain, or stabilize prices of Refined Sugar sold in the United States to Plaintiffs at supracompetitive levels.

275.    This conduct is unlawful under either a quick look or a full-fledged rule of reason analysis because the agreement is facially anticompetitive with no valid procompetitive justification. Moreover, even if there were valid procompetitive justifications, the Producer Defendants' objectives could have been reasonably achieved through less restrictive means.

276.    The contract, combination, or conspiracy alleged herein has had the following effects, among others:

(a) Price competition in the sale of Refined Sugar has been restrained, suppressed, and/or eliminated in the United States;

(b) Prices for Refined Sugar sold by the Producer Defendants have been raised, fixed, maintained, or stabilized at artificially high, noncompetitive levels throughout the United States;

(c) Plaintiffs purchased Refined Sugar directly from the Producer Defendants and their co-conspirators and have been deprived of the benefits of free and open competition; and

(d) Plaintiffs are entitled to treble damages against Defendants.

277.    Plaintiffs have been injured in their businesses or properties by paying more for Refined Sugar purchased directly from the Producer Defendants or their co-conspirators than

Plaintiffs would have paid in the absence of the contract, combination, or conspiracy. Plaintiffs will continue to be injured in their business and properties by reason of Defendants' continuing violations of Section 1 and 3 of the Sherman Act, within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

278.    Plaintiffs are entitled to treble damages and injunctive relief against Defendants, preventing and restraining the violations alleged herein.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand a trial by jury and respectfully request:

a.    That the unlawful contract, combination, or conspiracy alleged herein be adjudged and decreed in violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3;

b.    That Plaintiffs recover damages to the maximum extent allowed under federal law, and that a joint and several judgment in its favor be entered against Defendants in an amount to be trebled to the extent such laws permit;

c.    That Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the contract, combination or conspiracy alleged herein, or from entering into any other contract, combination or conspiracy having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

d.    That Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the sharing CSI that permits individual identification of a company's information;

e.    That Plaintiffs be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

f.     That Plaintiffs recover their costs of suit, including reasonable attorneys' fees, expenses, and costs as provided by law; and

g.     That Plaintiffs have such other and further relief as the case may require and the Court may deem just and proper.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a trial by jury in this action of all issues so triable.

Respectfully submitted,

Dated: July 24, 2026

*/s/ Ryan W. Marth*
Ryan W. Marth
**CROWELL & MORING LLP**
60 South Sixth Street, Suite 1100
Minneapolis, MN  55402
Phone: 612-656-7180
Fax: 612-503-3869
rmarth@crowell.com

Deborah E. Arbabi*
3 Park Plaza, 20th Floor
Irvine, CA 92614
Phone: 949-798-1318
Fax: 949-263-8414
darbabi@crowell.com

William V. Reiss*
Laura Song*
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
Phone: 212-803-4029
Fax: 212-223-4134
wreiss@crowell.com
lsong@crowell.com

*Attorneys for Plaintiffs*
*\*Pro hac vice forthcoming*

75